In re ADOPTION OF G.R.L.

Appeal of T.K., Mother.

In re Adoption of G.R.L.

Appeal of P.L., Father.

In re Adoption of A.J.L.

Appeal of T.K., Mother.

In re Adoption of A.J.L.

Appeal of P.L., Father.

Superior Court of Pennsylvania.

Argued June 21, 2011.
Filed July 22, 2011.

---

Jordana Frankel, Public Defender, Willow Grove, for T.K. and P.L., appellants.

Craig B. Bluestein, Norristown, for appellee.

George B. Ditter, Norristown, for Montgomery County Children and Youth, participating party.

BEFORE: STEVENS, P.J., GANTMAN, and OTT, JJ.

OPINION BY GANTMAN, J.:

Appellants, P.L. ("Father") and T.K. ("Mother") (collectively "Parents"), appeal

from the orders entered in the Montgomery County Court of Common Pleas, Orphans' Court, terminating their parental rights to G.R.L. and A.J.L. ("Children"). We hold the record belies Parents' claim that OCY failed to meet the requirements of the Kinship Care Program at 62 P.S. § 1303. Moreover, the termination hearing was not the proper stage to inquire into the best adoptive alternative for Children, and it would be premature to resolve at the termination hearing Grandfather's expressed desire to adopt Children. Thus, we decline to vacate the termination orders on the grounds alleged. Accordingly, we affirm.

The relevant facts and procedural history of this case are as follows. In December 2005, the Montgomery County Office of Children and Youth ("OCY") received a referral regarding Parents' family, expressing concerns about Parents' mental health. Between April 2006 and February 2007, OCY received three more referrals concerning Parents' poor home conditions, and Father's possible drug use and failure to take medication. On May 30, 2007, following a fifth referral, police took Children into protective custody after finding Parents' kitchen covered in old food, grease, and miscellaneous debris. Subsequently, Parents moved to a new residence, and the court returned Children to Parents on June 12, 2007.

OCY provided various services to Parents following the return of Children, including a third-party provider who helped monitor Parents' care of Children and helped address any Family Service Plan ("FSP") goals. OCY also provided a program to assist Parents with life learning skills. In July 2007, OCY received a sixth referral because Children were suffering from head lice and Father had stopped taking medication. On August 22, 2007, OCY received a seventh referral. An investigation revealed Parents' home was cluttered with exposed wires and debris on the floor (including feces), and other deplorable conditions.

On September 11, 2007, the court adjudicated Children dependent. In November 2007, Parents were directed to undergo psychological evaluations, the results of which diagnosed Mother with chronic bipolar disorder and Father with chronic paranoid schizophrenia. Thereafter, OCY discussed possible family resources with Parents, including Mother's cousin, Mother's sister, Father's parents, and Father's sister. Following investigation, OCY determined Parents' relatives were not appropriate resources for Children.

OCY set FSP goals for Parents necessary to achieve reunification. FSP goals included maintaining a clean home environment, maintaining financial resources, and vocational training for Mother. Parents had to attend parenting classes, demonstrate emotional stability, and cooperate with OCY. OCY reviewed the goals and plans with Parents, and Parents signed each plan. Although Parents made some progress in keeping the house clean, Parents did not regularly maintain the house in a suitable living condition. During visits to the home, OCY continued to find exposed wires, debris, feces in the shower, and other poor conditions. Mother completed vocational training, and Parents completed parenting classes; but they failed to demonstrate they had retained knowledge from those classes. Father eventually became compliant in taking medication. Despite Parents' efforts, Parents struggled to cooperate with OCY and meet their FSP goals on a consistent basis.

On July 18, 2008, OCY asked Parents if they had any family member they wished to be considered as a resource for Children; if so, Parents should inform that family member to contact OCY. On July

31, 2008, OCY sent a letter to Parents indicating no family member had contacted OCY, and told Parents any possible family resource must contact OCY by August 11, 2008. No family member contacted OCY. Subsequently, OCY filed a petition for goal change from reunification to adoption. On September 9, 2008, September 17, 2008, and October 21, 2008, the court held hearings on OCY's petition. On January 23, 2009, the court denied OCY's petition for goal change, but kept Children in foster care. During visitation, Parents continued to struggle with understanding how to protect Children. Specifically, Parents allowed Children to run into the street, and Parents failed to anticipate dangerous situations. Parents also displayed verbal outbursts toward OCY workers, and Father threatened a worker with his fist.

On August 4, 2009, the court ultimately suspended Parents' visitation with Children. On December 9, 2009, the court changed the goal from reunification to adoption. Parents did not appeal the court's goal change decision. On December 30, 2009, OCY filed a petition for involuntarily termination of Parents' parental rights to Children. Following hearings on April 8, 2010, and May 7, 2010, the court terminated Parents' parental rights on January 20, 2011.

On February 18, 2011, Mother timely filed notices of appeal from the court's orders terminating her parental rights to Children, docketed at 509 EDA 2011 and 511 EDA 2011. Father also timely filed notices of appeal from the court's orders terminating his parental rights to Children, docketed at 510 EDA 2011 and 512 EDA 2011. Parents filed concise statements of matters complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i), with their respective notices of appeal. This Court consolidated Mother and Father's

appeals, and Parents filed a joint appellate brief.

Parents raise two issues for our review: [WHETHER] OCY FAILED TO ACT IN CONFORMITY WITH 62 P.S. § 1303 BY FAILING TO FIRST CONSIDER PLACEMENT WITH THE FAMILY'S RELATIVES[?]
[WHETHER] THE ORPHAN'S COURT ABUSED ITS DISCRETION BY FAILING TO CONSIDER GRANDFATHER'S DESIRE TO ADOPT [CHILDREN?]

(Parents' Brief at 5).

■ For purposes of disposition, we combine Parents' issues. Parents argue 62 P.S. § 1303 (Kinship Care Program) requires OCY to contact family members who might be a resource for children and to document such efforts, once the children are removed from the parents' home. Parents assert OCY did not meet this requirement, where Parents aver Mother informed OCY that her father ("Grandfather") was interested in keeping Children, but OCY neither considered him nor documented reasons why. Parents claim OCY's failure to consider Grandfather's interest in Children caused Children to remain in foster care, which led to Children's emotional attachment to a non-biological foster family. Parents contend OCY did not provide necessary services to achieve the safe return of Children to Parents or their family members because OCY made no effort to use Grandfather as a resource. Parents maintain OCY's failure to investigate Grandfather as a potential familial resource constitutes an exception to termination of parental rights, under 42 Pa.C.S.A. § 6351(f)(9)(iii) (stating court can change goal from reunification to adoption when child has been in foster care for at least fifteen (15) of last twenty-two (22) months, reasonable efforts toward reunification are no longer necessary, and

agency has sought to terminate parental rights, **unless** OCY has failed to provide family with necessary services to achieve reunification under OCY's permanency plan).

Parents also argue the court should have but refused to consider Grandfather's expressed desire at the termination hearing to adopt Children. Parents aver Children's best interest and welfare would be served by allowing Grandfather to adopt, if he is qualified, because it would promote their bond with their biological family. Parents fear that the court will refuse to value Grandfather's wishes to adopt Children and Grandfather's petition might not be heard during adoption proceedings because actions taken before termination of parental rights will be deemed irrelevant. Parents are concerned when, if ever, Grandfather's desire and efforts to adopt Children will be heard. Parents conclude the orders terminating their parental rights to Children should be overturned; and OCY must be ordered to act pursuant to Section 1303, giving consideration to Grandfather as an adoptive resource. For the following reasons, we decline to give Parents the relief they request.

The statute outlining the Kinship Care Program provides, in pertinent part:

§ 1303. Kinship Care Program

\* \* \*

■■■ (b) Placement of children.— If a child has been removed from the child's home under a voluntary placement agreement or is in the legal custody of the county agency, the county agency shall give first consideration to placement with relatives. The county agency shall document that an attempt was made to place the child with a relative. If the child is not placed with a relative, the agency shall document the reason why such placement was not possible.

62 P.S. § 1303(b). "[K]inship care is a subset of foster care where the care provider already has a close relationship to the child. In kinship care (as with foster care generally), legal custody of the child is vested in [OCY]. [OCY] then places the child with the care provider." *In re J.P.*, 998 A.2d 984, 987 n. 3 (Pa.Super.2010). The court may place children with a foster family, although there might be willing relatives, where foster care is in the best interests of the children or aggravated circumstances exist. *In re R.P.*, 957 A.2d 1205 (Pa.Super.2008) (holding court properly declined proposed kinship care arrangement due to aggravated circumstances, where mother knew father was abusing child but failed to protect child from further abuse; children's grandfather was widower with pacemaker who lived close to father, and children's uncle had no experience in raising children; placement of children with relatives would put children at further risk of abuse); *In re C.J.R.*, 782 A.2d 568 (Pa.Super.2001) (holding court properly declined to remove children from foster home and place them with biological grandparents, where removal from foster home could stunt positive gains in belated development due to "failure to thrive" diagnosis, and grandparents came from dysfunctional family environments). The goal of preserving the family unit cannot be elevated above all other factors when considering the best interests of children, but must be weighed in conjunction with other factors. *In re Davis*, 502 Pa. 110, 125, 465 A.2d 614, 621 (1983).

With respect to an individual's desire to adopt, our Supreme Court has stated:

The Adoption Act sets forth specific procedures that must be followed by a party seeking to adopt a child.... A party seeking to adopt a child must first file a Report of Intention to Adopt. 23 Pa. C.S.[A.] § 2531(c). A report is also filed

by the intermediary who arranged the adoption, and an investigation is conducted to determine the suitability of the adoption. 23 Pa.C.S.[A.] § 2535. Once the proposed adoption is determined to be feasible, the adoption procedure is commenced. 23 Pa.C.S.[A.] § 2701 *et seq.* A Petition to Adopt must be filed, and the court shall obtain any necessary consents to the adoption. 23 Pa.C.S.[A.] § 2711(a). The court then holds a hearing for a final determination of whether the adoption decree should be entered. 23 Pa.C.S.[A.] § 2721. At all stages of the proceedings, the best interest of the child is the paramount consideration. *See* 23 Pa.C.S.[A.] § 2902(a).

*In re Adoption of Hess,* 530 Pa. 218, 223–24, 608 A.2d 10, 13 (1992) (internal footnotes omitted). A petition for adoption must include all requisite information and consents. *In re Adoption of J.E.F.,* 587 Pa. 650, 902 A.2d 402 (2006); 23 Pa.C.S.A. § 2701 (requiring petition for adoption to include name, marital status, relationship, if any, to adoptee, required consents, and other pertinent background information).

With respect to a grandparent's desire to adopt:

[T]he [Adoption] Act contemplates that a grandparent might choose to adopt his ... grandchild, and allows the grandparent to benefit from the relationship to the child by relieving the grandparent of the obligation to file a Report of Intention to Adopt. 23 Pa.C.S.A. § 2531(c). Thus while the Act does not reflect a preference for a grandparent's adoption, it clearly does not exclude grandparents from being considered as prospective adoptive parents. A grandparent seeking to adopt a grandchild also must indicate his ... relationship to that child in the Petition to Adopt. 23 Pa.C.S.A. § 2701(1). This requirement indicates

that a relationship between the proposed adoptive parent and the adoptee is a relevant consideration....

Finally, we think it is important to emphasize that by permitting the grandparents to intervene, we are not guaranteeing that they will prevail. Certainly there may be legitimate factors, such as health or infirmities, which might be construed against the grandparents. Nevertheless, they should be permitted to participate in the [adoption] proceeding just as any other individual or individuals who seek to adopt a child.

*In re Adoption of J.D.T.,* 796 A.2d 992, 994–95 (Pa.Super.2002).

Instantly, during multiple conversations with Parents, OCY discussed potential familial resources for Children. Although Parents had previously mentioned Mother's cousin, Mother's sister, Father's parents, and Father's sister as potential resources, following investigation, OCY determined these relatives were not appropriate resources for Children. OCY caseworker Sara Batipps testified:

When [Children] were initially placed, [Mother] let me know she had a family member [Mother's cousin] that would be interested in being a resource for the children. I did make contact with her. I had a discussion with her. She indicated to me that she would not be a resource. She initially wanted to be, and, in follow-up conversations, she denied that she would be able to take the children. So she was not looked at any further.

About nine months into the case, we revisited the family issue knowing that [OCY] would be petitioning the [c]ourt for a goal change because sufficient progress hadn't been made. I sat down with [Parents]. I asked them to identify

any family members that might be interested in [Children].

\* \* \*

With [regard] to [Father's] family, I did meet with his mom and dad in November and December of 2007. I spoke with them specifically about their ability to provide for the children or any of [Father's] siblings. And they denied that they, themselves, or any of their other children would be able to care for the [children].

(N.T. Termination Hearing, 4/8/10, at 165–66).

OCY did not investigate Grandfather as a resource because, during OCY's conversations with Mother, Mother indicated Grandfather was physically abusive to Mother when she was a child. On October 19, 2007, Mother said Grandfather "was not a good dad." (*See* Case Note, 10/19/07, at 1.) On December 12, 2007, Parents and Ms. Batipps spoke again about the possibility of Grandfather as a resource for Children, "but it was discussed that he would not be readily accessible." (*See* Case Note, 12/12/07, at 1.)[1] Thereafter, OCY asked if Parents had any family member they wished to be a resource for Children; if so, Parents should inform that family member to contact OCY directly. On July 31, 2008, OCY sent Parents a letter indicating it had not yet heard from any family members who wished to be a resource for Children. The letter also explained a possible goal change from reunification to adoption, and again requested Parents to offer OCY any family members available as a resource, no later than August 11, 2008. Parents did not offer Grandfather or any other family member as a potential resource, and **no** family member contacted OCY at the relevant time.

At the termination hearing on May 7, 2010, Mother acknowledged receipt of OCY's July 31, 2008 letter. Grandfather also admitted he did not contact OCY until December 2009, at the earliest, after the court had already changed the goal from reunification to adoption. Grandfather conceded Mother had not asked him for any assistance concerning Children, other than financial assistance, since OCY became involved with the family, and Grandfather has not seen Children since OCY's involvement began.

The record confirms OCY considered several of Parents' relatives (including Grandfather) as potential resources for Children while they were in foster care, and documented such efforts consistent with the Kinship Care statute. *See* 62 P.S. § 1303(b). OCY declined to place Children with Parents' proposed relatives because they were not appropriate resources for Children and did not deem Grandfather a potential resource, based on Mother's negative statements about him. *See In re R.P., supra; In re C.J.R., supra. See also In re A.K.,* 936 A.2d 528 (Pa.Super.2007) (explaining undisputed testimony of agency caseworker established agency had initially considered children's placement with paternal grandparents but did not recommend such placement due to safety concerns; parental grandparents were unable or unwilling to acknowledge that father could have been responsible for his children's injuries, and court was not confident children would be safe in paternal grandparents' care). Here, Parents had ample opportunity to provide OCY with potential familial resources for Children prior to the goal change proceedings but waited until the termination hearing to recommend Grandfather. Thus, the record belies Parents' contention that OCY did not consider Grandfather as a resource

1. Grandfather lives in Las Vegas, Nevada.

**1130**

for Children, under the Kinship Care statute; and the record supports the continued placement of Children in foster care during the pendency of the proceedings as in their best interests. *See* 62 P.S. § 1303(b); *In re Davis, supra.*

With respect to Parents' contention that the court should have considered Grandfather's desire to adopt Children, we observe Grandfather did not communicate his interest in adopting Children until the termination hearing on May 7, 2010. The court specifically explained that the termination hearing was not the proper time to inquire into the best adoptive alternative for Children, and it would be premature to resolve at the termination hearing Grandfather's desire to adopt Children. (*See* Trial Court Opinion, filed January 20, 2011, at 35–36 n. 4.) Furthermore, Parents no longer have any input regarding an adoptive placement for Children, where the court has terminated their parental rights and Parents have not challenged the court's specific findings in support of termination delineated in 23 Pa.C.S.A. § 2511. *See* 23 Pa. C.S.A. § 2521(a) (stating natural parents have no right to object to or receive notice regarding adoption proceedings after parental rights are terminated).

Based upon the foregoing, we hold the record belies Parents' claim that OCY failed to meet the requirements of the Kinship Care Program at 62 P.S. § 1303. Moreover, the termination hearing was not the proper stage to inquire into the best adoptive alternative for Children, and it would be premature to resolve at the termination hearing Grandfather's expressed desire to adopt Children. Thus, we decline to vacate the termination orders on the grounds alleged. Accordingly, we affirm.

Orders affirmed.