J-A05035-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| P. AND M.L. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellants | |
| v. | |
| S.K. AND R.L. | |
| Appellees | No. 1315 WDA 2016 |

Appeal from the Order August 2, 2016
In the Court of Common Pleas of Allegheny County
Family Court at No(s): FD14-005406-004

BEFORE:  BENDER, P.J.E., SHOGAN, J., and MOULTON, J.

MEMORANDUM BY MOULTON, J.:                **FILED APRIL 25, 2017**

P. and M.L. ("Grandparents") appeal from the August 2, 2016 order of the Allegheny County Court of Common Pleas denying Grandparents' complaint for custody of H.K. ("Child").  We affirm.

The trial court set forth the following factual background:

> [Child] is a two year old child, who has only lived in the home of her foster parents, having been placed with them upon her discharge from the hospital when she was two weeks old.  She had spent the first thirteen days of her young life detoxing:  Mother had tested positive for Subutex.  She does not know or have a relationship with her [paternal] grandparents.  Mother named R.L. as the alleged Father shortly before the child was adjudicated dependent on August 25, 2014.  Father R.L. is currently incarcerated.  He did not sign an acknowledgement of paternity, nor was his name on the birth certificate.  Father took a genetic test in November 2014; he was determined to be the child's biological Father on December 11, 2014. From January 2015 to April 2016, Father did not have any contact with [the Office of Children Youth and Families ("CYF")] or the Court despite receiving notice at his place

of incarceration. He did not hire an attorney, nor ask for visitation, nor participate in court hearings. Mother signed to voluntarily terminate her parental rights on April 15, 2016.

Only after the [termination of parental rights] petition was filed, did Father seek counsel; counsel entered her appearance on April 4, 2016. Counsel's first appearance on behalf of Father was at the July 11, 2016 permanency review hearing. Paternal Grandparents filed a "Grandparent Complaint for Custody" in April; their request for visitation and issues related to custody were ultimately deferred to the July 11, 2016 permanency review hearing. *See* Order of Court, dated June 16. 2016.

Opinion, 9/26/2016, at 1-2 ("1925(a) Op.").[1] At the July 11, 2016 hearing, the trial court heard testimony from CYF case supervisor Elizabeth Rider, Father, Paternal Grandmother, and Child's foster father.

Following this hearing, the trial court found that Child "shall remain with" her foster parents. Perm. Rev. Order at 4. The court further found that CYF shall "Offer Family Team Conferencing and Act 101 Mediation to foster parents[.] NO visitation shall be scheduled with paternal

---

[1] Grandparents complaint sought "primary custody" of Child. Grandparent Complaint for Primary Custody, filed Apr. 15, 2016. As the trial court noted, Grandparents "presumably" were seeking primary custody under 23 Pa.C.S. § 5324. 1925(a) Op. at 9.

grandparents . . . without approaching the court."[2]  *Id.*  On August 2, 2016,

the trial court issued an order denying Grandparents' custody complaint.[3]

Grandparents raise the following issues on appeal:

> I. The Trial Court committed abuse of discretion in failing to apply the factors of 23 Pa.C.S.A. § 5328.

> II. The Trial Court abused its discretion in its ruling that "it would be traumatic to [Child] [both to] be reunited [with] or introduced to people she does not know, given her current age and her current level of [st]ability with her current foster parents."

> III. The trial court erred in finding there was sufficient evidence presented at [the] hearing to establish that visitation with Paternal Grandparents outside of Act 101 mediation would not best serve the needs and welfare of the child.

Grandparent's Br. at Table of Contents.[4]

_____

[2] Father appealed from the July 11, 2016 permanency review order raising the same issues Grandparents raise herein.  That appeal is docketed at 1201 WDA 2016.

[3] The trial court also notes that the July 11, 2016 permanency review order at docket CP-02-DP-0001429-2014 also denied Grandparents' requested relief.  However, an order denying the custody complaint was not entered on the docket in the family court division until August 2, 2016.

[4] Grandparent's brief does not include a statement of questions involved as required by Pennsylvania Rule of Appellate Procedure 2116. However, because the table of contents and headings within the argument section delineate the issues, we decline to find waiver on that basis.

Grandparents[5] first contend the trial court abused its discretion by failing to apply the custody factors.[6]

_____

[5] The trial court states that Grandparents lack standing to seek custody. The parties, however, did not challenge Grandparents' standing below nor have they done so on appeal. A court may not raise the issue of standing *sua sponte*. **M.G. v. L.D.**, --- A.3d ----, 2017 Pa.Super. 29, at *2 n.5 (filed Feb. 8, 2017) (court cannot address standing *sua sponte*); **In re Adoption of Z.S.H.G.**, 34 A.3d 1283, 1289 (Pa. Super. 2011) (same). Although Child's guardian *ad litem* filed a brief in a companion appeal brought by Father, in which it argued that Father and Grandparents lacked standing, it did not file a brief in this appeal. Rather, the guardian *ad litem* filed a letter in which he stated that the Rule 1925(a) opinion "analyzes the issues and illustrates that the Trial Court did not abuse its discretion or err as a matter of law." Guardian's Letter to Super. Ct. dated Nov. 15, 2016.

[6] Section 5328 of the Child Custody Act provides:

> In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:
>
> (1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.
> (2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.
> (2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).
> (3) The parental duties performed by each party on behalf of the child.
> (4) The need for stability and continuity in the child's education, family life and community life.
> (5) The availability of extended family.
> (6) The child's sibling relationships.

*(Footnote Continued Next Page)*

"Our concern in any custody . . . matter is the best interest of the child, which considers all factors, on a case-by-case basis, that legitimately affect a child's physical, intellectual, moral, and spiritual well-being." **_S.J.S._**
**_v. M.J.S._**, 76 A.3d 541, 554 (Pa.Super. 2013). In custody cases, our standard of review is as follows:

> We review a trial court's determination in a custody case for an abuse of discretion, and our scope of review is broad. Because we cannot make independent factual

(Footnote Continued) ————————

> (7) The well-reasoned preference of the child, based on the child's maturity and judgment.
> (8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.
> (9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.
> (10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.
> (11) The proximity of the residences of the parties.
> (12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.
> (13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.
> (14) The history of drug or alcohol abuse of a party or member of a party's household.
> (15) The mental and physical condition of a party or member of a party's household.
> (16) Any other relevant factor.

23 Pa.C.S. § 5328(a).

determinations, we must accept the findings of the trial court that are supported by the evidence. We defer to the trial judge regarding credibility and the weight of the evidence. The trial judge's deductions or inferences from its factual findings, however, do not bind this Court. We may reject the trial court's conclusions only if they involve an error of law or are unreasonable in light of its factual findings.

*S.W.D. v. S.A.R.*, 96 A.3d 396, 400 (Pa.Super. 2014) (internal citations omitted). This Court has also stated that "the discretion that a trial court employs in custody matters should be accorded the utmost respect, given the special nature of the proceeding and the lasting impact the result will have on the lives of the parties concerned." *Ketterer v. Seifert*, 902 A.2d 533, 540 (Pa.Super. 2006) (quoting *Jackson v. Beck*, 858 A.2d 1250, 1254 (Pa.Super. 2004)). "[T]he knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record." *Id.* (quoting *Jackson*, 858 A.2d at 1254).

At the conclusion of the hearing, the trial court found the following:

With respect to the custody matter, it[']s obviously complicated by the issue of the fact that [Child] is a dependent child and has been a dependent child for two years, in the care of CYF through foster care. And therefore, the factors are complicated from the Court's perspective in a custody matter to apply, because of the nature of the circumstances; and it also assumes a certain level of parody [sic] in terms of responsibility and access, most of which when looking at the paternal grandparents' ability to be involved with this child have been limited by the father's actions.

And as a result of the father's actions the . . . paternal grandparents have had no involvement at all with this

child; and as a result, it is a very difficult situation that the Court is faced with, in the sense that applying the factors tends to assume that both parties have an equal opportunity to have been involved with the child and do some of the things that would allow the Court to find them to be people for whom the child should have an ongoing relationship.

This Court finds that the current caregivers for [Child] are performing parental duties and have provided stability and continuity in her family life and her community life; that the child is too young to express a preference; that the child's parents have not been involved with her life for the last two years; that they have maintained a loving, stable and consistent relationship with this child; that her emotional needs have been met; that any developmental needs have been met; that they have made any necessary child care arrangements; that there is no reported history of drug or alcohol abuse of the caregivers, and there is a mental health history reported as to Father, but there is no history reported as to paternal grandparents; that the child's psychological, emotional and developmental health may be compromised by trying to move her in any way to a different home, as that she is currently emotionally secure, progressing well in her development, and Dr. Rosenblum's evaluation is very clear that she is in a warm, nurturing, engaging home.

Therefore, this Court finds that any custody claim on the part of the paternal grandparents is, in fact, dismissed at this time; that the case should proceed on the dependency side, and as previously described all parties should be offered Act 101[7] mediation to determine

---

[7] Act No. 2010-101 amended the Adoption Act, by, among other things, providing for continuing contact with birth relatives. 2010 Pa. Legis. Serv. Act 2010-101 (S.B. 1360). The statute provides:

The purpose of this subchapter is to provide an option for adoptive parents and birth relatives to enter into a voluntary agreement for ongoing communication or contact that:

*(Footnote Continued Next Page)*

whether that would be [a]n appropriate level of contact to have between current caregivers in the event that termination is granted, as well as with her biological family.

N.T., 7/11/16, 81-84.

In its Rule 1925(a) opinion, the trial court concluded:

The Court conducted a custody analysis, despite very little testimony and evidence on behalf of the petitioner. The concise statement does not offer any other guidance as to what aspects of its analysis were faulty, only that this Court "failed to apply" the factors. This Court did not so fail. Rather, the Court noted the difficulty in addressing the custody factors in a situation where one party has never had any relationship with the child. The Court believed Paternal Grandmother when she testified that Father only recently told her about [Child]'s existence. The Court is not ignorant of the what-ifs looming in the background of this case, but they do not change the facts as they stand. This child has only known two caregivers in her life, the foster parents. The Court cannot find any possible reason why custody time with the Paternal Grandparents would be in the child's best interests other than the notion that children belong with "blood relatives." But this would be an erroneous basis to change the custody arrangement for a child of this age, this late in the dependency ease. *See* CYF Exhibit I, at 3.

_(Footnote Continued)_ ⸻⸻⸻⸻⸻

(1) is in the best interest of the child;

(2) recognizes the parties' interests and desires for ongoing communication or contact;

(3) is appropriate given the role of the parties in the child's life; and

(4) is subject to approval by the courts.

23 Pa.C.S. § 2731.

1925(a) Op. at 9-10.

The trial court considered the custody factors, and its findings are supported by the record. Further, the trial court did not abuse its discretion in finding that it was in Child's best interest to remain with her foster family. *See In re C.J.R.*, 782 A.2d 568, 574 (Pa.Super. 2001) (trial court did not abuse its discretion in finding custody should not be transferred from foster parents to grandparents where evidence established, among other things, that child will face adjustment difficulties, child had experienced difficulties in her short life, and child now enjoyed loving, stable environment); *cf. In re Adoption of G.R.L.*, 26 A.3d 1124, 1127 (Pa.Super. 2011) (addressing appeal of termination of parental rights wherein parents argued OCY failed to meet requirement of kindship care program and stating that "[t]he goal of preserving the family unit cannot be elevated above all other factors when considering the best interests of children, but must be weighed in conjunction with other factors").[8]

---

[8] Grandparents' reliance on *In the Int. of James John M.*, 482 A.2d 637 (Pa.Super. 1984), is misplaced. In that case, the grandmother claimed the court erred in awarding custody of the child to the child's father. *Id.* at 638. Accordingly, the custody dispute was between a parent and a third party. *Id.* This Court affirmed the trial court, finding that the grandmother failed to satisfy "her admittedly heavy burden of advancing convincing reasons why James' best interests require that he remain in her custody," *id.* at 642, and noting that "where circumstances do not clearly indicate the appropriateness of awarding custody to a non-parent, we believe the less intrusive and hence the proper course is to award custody to the parent or parents," *id.* at 642-43 (quoting in part *Ellerbe v. Hooks*, 416 A.2d 512 (Pa. 1980)). Here, neither of Child's parents is seeking custody.
*(Footnote Continued Next Page)*

We will address Grandparents' next two issues together. Grandparents maintain that the trial court abused its discretion in finding that it would be traumatic to Child to be reunited with or introduced to people she does not know. Grandparents further argue that the trial court erred in finding there was sufficient evidence presented at the hearing to establish that visitation with Paternal Grandparents outside of Act 101 mediation would not best serve the needs and welfare of the child. They contend that CYF failed to conduct a proper kinship care search[9] and,

*(Footnote Continued)* ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

[9] The Kinship Care Program section of the Family Finding and Kinship Care Act provides:

> **(a.1) Relative notification.--**Except in situations of family or domestic violence, the county agency shall exercise due diligence to identify and notify all grandparents and other adult relatives to the fifth degree of consanguinity or affinity to the parent or stepparent of a dependent child and each parent who has legal custody of a sibling of a dependent child within 30 days of the child's removal from the child's home when temporary legal and physical custody has been transferred to the county agency.
>
> . . .
>
> **(b) Placement of children.--**If a child has been removed from the child's home under a voluntary placement agreement or is in the legal custody of the county agency, the county agency shall give first consideration to placement with relatives or kin. The county agency shall document that an attempt was made to place the child with a relative or kin. If the child is not placed with a relative or kin, the agency shall document the reason why such placement was not possible.

*(Footnote Continued Next Page)*

therefore, Grandparents were not provided an opportunity to serve as a kinship placement.

The trial court found:

> [T]he Court ordered CYF to offer Family Team Conferencing and Act 101 Mediation to the foster parents to first see whether an agreement can be reached regarding potential contact between the child and Paternal

_(Footnote Continued)_ ———————————

62 P.S. § 1303(a.1), (b).  This Court has explained that:

> "[K]inship care is a subset of foster care where the care provider already has a close relationship to the child.  In kinship care (as with foster care generally), legal custody of the child is vested in [OCY].  [OCY] then places the child with the care provider." **In re J.P.**, 998 A.2d 984, 987 n. 3 (Pa.Super. 2010).  The court may place children with a foster family, although there might be willing relatives, where foster care is in the best interests of the children or aggravated circumstances exist.  **In re R.P.**, 957 A.2d 1205 (Pa.Super. 2008) (holding court properly declined proposed kinship care arrangement due to aggravated circumstances, where mother knew father was abusing child but failed to protect child from further abuse; children's grandfather was widower with pacemaker who lived close to father, and children's uncle had no experience in raising children; placement of children with relatives would put children at further risk of abuse); **In re C.J.R**., 782 A.2d 568 (Pa.Super. 2001) (holding court properly declined to remove children from foster home and place them with biological grandparents, where removal from foster home could stunt positive gains in belated development due to "failure to thrive" diagnosis, and grandparents came from dysfunctional family environments).

**In re Adoption of G.R.L.**, 26 A.3d 1124, 1127 (Pa.Super. 2011) (alterations in original).

Grandparents. *See* Permanency Review Qrder, dated July 11, 2016, at 4. The Court further ordered that there be no visitation scheduled without approaching the court. *Id.* The child has resided with her foster parents during her entire life, save the first thirteen days of her life, which she spent in the hospital detoxing from the Subutrex her mother abused during the pregnancy. Along with her foster sister, they are all that she knows. At the permanency review hearing, the Court accepted without objection the psychological evaluation conducted by Dr. Neil Rosenblum, marked as CYF's Exhibit 1. Predictably, the child has developed a bond with the foster parents. And because the child has formed a "very strong, primary and exclusive attachment" to her foster parents, Dr. Rosenblum cautioned, and this Court agreed, that removal from the foster parents could "potentially expose [Child] to traumatic emotional experiences, pronounced adjustment difficulties and the possibility of an eventual attachment disorder." *See* Exhibit 1, at 3. Dr. Rosenblum recommended that the Court "proceed in a cautious and informed manner before making decisions about future visitation and permanency planning for [Child] at this time." *Id.*, at 3-4. Father[10] takes issue with the Court's findings, but those findings were based on an expert report introduced without objection or argument.

Paternal Grandparents made it clear that they intended to be the primary custodians of [Child], at least until Father's release from prison, which is supposedly going to happen in March 2017. The Court does not agree with Paternal Grandmother's assessment that, with time, [Child] would "adjust" and develop "the same attachment" with her biological family. *See* Transcript of Testimony, dated July 11, 2016, at 50-53. In fact, expert evidence indicated the opposite. In her[] current home, [Child] is "clearly thriving" in her environment. *Id.*, at 3. Her foster parents "do an excellent job of promoting her learning and

---

[10] Father also claimed the trial court committed error by finding it would be traumatic to Child to be reunited or introduced to paternal grandparents and that it erred in not allowing visitation outside the scope of Act 101 mediation.

developmental progress." ***Id.*** Perhaps there will be contact between the child and Paternal Grandparents, but the Court was prepared to heed Dr. Rosenblum's recommendation that this Court proceed with visitation in a "cautious and informed manner." [That] means waiting to see if the parties engaged in Act 101 Mediation and Family Team Conferencing, followed by another request of the Court. Reliance on this expert opinion was not an abuse of the Court's discretion.

1925(a) Op. at 6-7. We agree. The trial court did not abuse its discretion in relying on the expert report to determine what would be in Child's best interest and did not abuse its discretion in proceeding in a cautious manner.

Further, to the extent Grandparents claim the trial court erred because it should have awarded visitation because CYF failed to conduct a kinship placement search, we find the issue lacks merit.

The trial court found:

Father admitted that he did not tell Paternal Grandparents the existence of the two-year-old until December 2015-January 2016. He stated that he did not want to put undue stress on his mother on account of her health and that he did not want people to be disappointed in him. ***Id.***, at 25-26.

The CYF supervisor testified that Family Finding on the maternal side was conducted after the child's birth, but that paternal Family Finding had to wait until after Father completed genetic testing in November 2014. By then, however, it was apparent that Father did not want to respond to CYF. Consequently, and per the testimony of the CYF supervisor, the agency was not aware of the Paternal Grandparents until Paternal Grandparents contacted CYF in April 2016. ***See Id.***, at 64. This timeline is substantially similar to the timeline offered by Paternal Grandmother, who testified credibly that her Husband told her about [Child] only as recently as January 2016. ***Id.***, at 45. She testified that she called CYF "immediately" but does not remember who she spoke to until she recalled

- 13 -

speaking with the caseworker in April 2016. While navigating dependency court with CYF, Paternal Grandparents also filed in the adult section of Family Court seeking custody and visitation. They filed their complaint in custody in April 2016.

. . .

Father was incarcerated throughout the life of the child, and thus the life of the case. He received notice after notice, and order after order, regarding the placement of his child. The Court does not believe his testimony for one moment that he thought the child was with Mother the entire time, nor that he bounced around in the prison so much that he only received documentation once the [petition to terminate parental rights] was filed. **See** T.T., at 14-26. While the Court notes that CYF's Family Finding recordkeeping has been spotty, per the testimony of the CYF supervisor, it is unreasonable to blame CYF for Father's decision to keep his Parents in the dark. **See Id.**, at 40.

1925(a) Op. at 7-8. This was not an abuse of discretion.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/25/2017