J-S65017-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: Z.B., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: C.B., PATERNAL | : | |
| GRANDMOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1231 MDA 2019 |

Appeal from the Order Entered, June 20, 2019,
in the Court of Common Pleas of Northumberland County,
Orphans' Court at No(s):  ADOPTEE 39-2016.

BEFORE:   PANELLA, P.J., KUNSELMAN, J., and COLINS, J.[*]

MEMORANDUM BY KUNSELMAN, J.:            **FILED DECEMBER 20, 2019**

Appellant C.B. (Paternal Grandmother) appeals the order denying her petition for the adoption of her five-year-old grandson, Z.B. (Child), filed pursuant to the Adoption Act, 23 Pa.C.S. §§ 2101–2910.[1]  In denying Paternal Grandmother's petition, the court determined that Child's best interests favored an adoption by T.R. and F.R. (Kinship Parents) and allowed them to proceed with their respective adoption petition.  After review, we affirm.

The extensive record discloses the following relevant history:

Child was born in August 2013 to L.W. (Mother) and D.B. (Father).  The parents were still in high school when Child was born.  While she was

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] Paternal Grandmother's husband was a co-petitioner in her effort to adopt Child; however, only Paternal Grandmother appeals the orphans' court decision.

pregnant, Mother met Kinship Parents through a social function at a local fire hall. Mother discussed her pregnancy with Kinship Mother, who was a pediatric nurse. When Child was born, he spent the early days of his life in a neonatal intensive care unit (NICU). After his release, Mother and Father knocked on the door of Kinship Parents, looking for help. From that point on, Kinship Parents' involvement was extensive.

Biological Parents struggled as they tried to finish school and find work. It did not take long before Kinship Parents became the primary resource for the Biological Parents. Kinship Parents watched the baby multiple days per week while the parents went to school, worked, and socialized. This care included overnight stays. When the Biological Parents brought Child to Kinship Parents, Child was often dirty and hungry. Kinship Parents would feed and bathe Child. They would also buy diapers. Biological Parents would take Child to Kinship Parents in the middle of the night when they could not calm him. During the first 18 months of Child's life, Mother testified that Child essentially lived at Kinship Parents' home.

Kinship Mother noticed that Child appeared weak on his left side. This led to a diagnosis that Child may have suffered a stroke in utero. Kinship Parents then transported Child to and from various medical appointments. Because it was more convenient for everyone, and because Child was already spending the lion's share of his time in the Kinship home, Kinship Parents hosted Child's physical therapy at their home. Kinship Mother even

handpicked Child's doctors based on her experience as a medical professional in the area.

Eventually, CYS became involved after learning of the parents' lack of stable housing, food insecurity, and safety concerns. In one incident, Child swallowed a tide pod while in Mother's care and nearly died. Biological Parents called Kinship Parents from the emergency room and asked them to come. At one point, only one guest was allowed to be by Child's bedside, and the Biological Mother asked Kinship Mother to be that person. In another incident, when Child was approximately two-years-old, doctors determined that Child suffered a non-accidental bruise on his penis. This was the impetus for Child's formal removal from Biological Parents' care. In August 2015, Child was adjudicated dependent and placed with Kinship Parents.

Paternal Grandmother also played a role in Child's life. However, the record reveals that this relationship was, at best, a traditional grandparent-grandchild connection. Even then, regular contact did not begin until Child was adjudicated dependent around his second birthday. Prior to that, Paternal Grandmother was present at Child's birth and visited Child several times a year. Biological Father was not on good terms with Paternal Grandmother, and did not want to ask Paternal Grandmother for help, despite Child's considerable needs and lack of resources. Paternal Grandmother also lived approximately 75 miles away, and she testified that Biological Mother did not want her involved.

When Child was removed by CYS and placed with Kinship Parents, Paternal Grandmother claimed she met with CYS to be a placement option. Initially, it was unclear whether Paternal Grandmother wanted to be an adoptive resource. CYS articulated that Paternal Grandmother needed proper clearances before she could visit with Child. Notwithstanding the reasons for the delay, Paternal Grandmother did not petition to intervene in Child's dependency case until September 2016, a full year after Child was adjudicated dependent. Once Paternal Grandparents joined the dependency case, the court awarded them visitation on several weekends per month.

The initial goal of the dependency proceedings was for Child to reunify with Biological Parents. Over time, they could not alleviate the concerns that led to Child's removal. All the while, Child thrived in the home of Kinship Parents. CYS petitioned to involuntarily terminate Biological Parents' rights, but before the court held a final hearing, Biological Parents voluntarily consented to the termination.

Kinship Parents and Paternal Grandparents filed cross petitions for adoptions, pursuant to 23 Pa.C.S. § 2701. The orphans' court conducted a hearing over the course of five dates between December 2018 and May 2019. The court heard testimony from 18 witnesses, including CYS caseworkers, Child's medical professionals, the respective petitioners and members of their families.

On June 20, 2019, the orphans' court dismissed Paternal Grandparents' petition for adoption. Paternal Grandmother filed this timely appeal.

She presents one multifaceted issue for our review:

> Did the trial court err or abuse its discretion in denying [Paternal Grandmother's] petition to adopt where [Paternal Grandmother] had a long-standing relationship with [C]hild from birth and had significant periods of custody during the case, where [C]hild had a clear bond with [Paternal Grandmother], where [Paternal Grandmother] diligently pursued and acquired both kinship care certification and foster care certification while [C]hild was a dependent child for the sole purpose of becoming a placement resource for [C]hild, where the actions of [CYS] conducted no Family Finding to identify [Paternal Grandmother] or include [Paternal Grandmother] in the process, where the excessive length in time during the pendency of the matter enhanced the relationship and bond, and where the court refused to appoint an expert to conduct an evaluation to determine what impact, if any, severing the relationship would have on the child.

Paternal Grandmother's Brief at 7.

Appellate review an orphans' court adoption determination for an abuse

of discretion:

> When reviewing a decree entered by an orphans' court, this Court must determine whether the record is free from legal error and the court's factual findings are supported by the evidence. Because the orphans' court sits as the fact-finder, it determines the credibility of the witnesses, and on review, we will not reverse its credibility determinations absent an abuse of discretion.

*In re E.M.I.,* 57 A.3d 1278, 1284 (Pa. Super. 2012) (citation omitted).

The polestar of adoption proceedings is the best interest of the adoptee.

Pursuant to 23 Pa.C.S. § 2902(a), the orphans' court must determine whether

the proposed adoption would promote the child's needs and welfare:

- 5 -

> If satisfied that the statements made in the petition are true, that the needs and welfare of the person proposed to be adopted will be promoted by the adoption and that all requirements of this part have been met, the court shall enter a decree so finding and directing that the person proposed to be adopted shall have all the rights of a child and heir of the adopting parent or parents and shall be subject to the duties of a child to him or them.

23 Pa.C.S. § 2902(a).

We also observe that the child's best interest is the only relevant factor in determining whether to grant or deny a petition. **See** 23 Pa.C.S. § 2724(b). Section 2724(b) provides, in relevant part: "[T]he age, sex, health, social and economic status or racial, ethnic or religious background of the child or adopting parents shall not preclude an adoption but the court shall decide its desirability on the basis of the physical, mental and emotional needs and welfare of the child." **See also In re K.D.**, 144 A.3d 145, 152-153 (Pa. Super. 2016) (citation omitted).

When the choice becomes whether to keep a child with the biological family, we have acknowledged that family preservation is the desired outcome. **In re K.D.**, 144 A.3d at 153. "However, the goal of preserving the family unit cannot be elevated above all other factors when considering the best interests of the children, but must be weighed in conjunction with other factors." **Id.** (citing **In re Adoption of G.R.L.**, 26 A.3d 1124, 1127 (Pa. Super. 2011).

Paternal Grandmother's primary argument is that she has a clear bond with Child, who expressed a desire to have a relationship with her. Testimony

- 6 -

revealed that Child does have a familial bond with Paternal Grandmother and enjoys his time with her. However, this fact obscures the nature of the case.

We do not reduce a best interest analysis in an adoption case to a battle of the bonds. But it is evident that Child's primary bond is to Kinship Parents. Part of the reason Child was placed in their care was their close relationship prior to CYS involvement. N.T., 5/3/19 (Day 5), at 157-158. The psychologist who conducted an expert evaluation of Child concluded that Child recognizes Kinship Parents as the most consistent and persistent source of safety, security, and nurturing. N.T., 12/12/18 (Day 2), at 37. To that end, he is spontaneously affectionate with them. *Id.* at 37-38. Child has spent every Christmas and every birthday with them in their primary care. *Id.* at 37. He refers to Kinship Parents as mom and dad. The court also heard expert testimony that Child has a very strong emotional attachment to them.

The psychologist who evaluated Child recommends that Child still continue to have a relationship with his Grandparents, but fully recommends adoption by Kinship Parents. Part of the reason for this recommendation was Child's significant medical needs resulting from the stroke. The psychologist classified these needs as chronic and persistent. *Id.* at 33-34. His condition resembles cerebral palsy, but would not necessarily be identified as such as he gets older. He receives numerous services aimed at improving his walking ability and monitoring his overall cognitive motor development. *Id.* He wears a leg brace for support. *Id.*

Child's pediatrician also testified that Child displayed behavioral concerns, though he is still too young for a definitive diagnosis regarding ADHD or learning deficits. *Id*. at 67. Child receives learning support at school. While his pediatrician described Child's prognosis as excellent, she testified that Child will need extra care, including aggressive physical therapy and bracing. *Id.*, at 67, 69. The psychologist concluded that Kinship Mother's experience as a pediatric nurse "would help as an asset in both coordinating the child care and continuing to care for [Child] as he progresses." *Id.*, at 33.

While the orphans' court determined that Kinship Parents were involved since birth, it determined that Paternal Grandmother was not heavily involved in Child's life. Prior to Child's dependency adjudication, Paternal Grandmother visited Child only sporadically. While Paternal Grandmother became more involved after officially joining the dependency proceedings, the record reveals that Child's relationship with Paternal Grandmother was not as significant as the one he shared with Kinship Parents.

When Child returned from weekend visits with Paternal Grandparents, Child regressed in his physical and behavioral development. *Id.*, at 30. For instance, he displayed more weakness in his left foot and grinded his teeth at night. *Id.* Paternal Grandparents acknowledged that Child's behavioral issues had made their visits challenging. Sometimes he would get upset when reprimanded by them. Transitions between Kinship Parents and Paternal Grandparents were particularly tense. Child would yell and kick; he would

scream that he wanted his mommy (in reference to Kinship Mother). ***Id.***, at 38.

The orphans' court agreed with the psychologist's nuanced recommendation that a continued relationship with both sets of petitioners would be in Child's best interests, but the court wisely acknowledged that it could not order the same. Thus, given the blunt choice between Paternal Grandparents and Kinship Parents, the orphans' court concluded that adoption by Kinship Parents would be in Child's best interests. This determination is supported by the record.

Paternal Grandmother's appeal essentially dissolves here, as none of her other issues have bearing on the ultimate question: what is in Child's best interests? Nevertheless, we address those matters contemporaneously as follows.

Paternal Grandmother argues that, because of CYS "stonewalled" her efforts to become an adoptive resource, the proverbial dye was cast long ago. She contends that because CYS did not include her in the process from the beginning, the dependency proceeding only enhanced the bond Child shared with Kinship Parents. This argument is misplaced and without merit.

Since his birth, Child was always closer with Kinship Parents than Paternal Grandparents. This is not necessarily the fault of Paternal Grandparents, and certainly not the fault of Kinship Parents. Biological Parents purposefully sought to limit contact between Child and Paternal Grandparents. And when Biological Parents were in need, they knocked on

Kinship Parents' door, not the door of Paternal Grandparents. CYS logically identified Kinship Parents as a favorable placement option.

One reason that Kinship Parents were ideal for Child's placement was because Biological Parents had such a positive relationship with them. After all, Kinship Parents were a "kinship" in their own right. *See* 67 Pa.C.S. § 3102 (Definitions).[2] And lest it be forgotten, the goal of Child's dependency proceedings was to reunify Child with Biological Parents. While Kinship Parents immediately held themselves out as an adoptive resource, they had supported the Biological Parents since Child's birth. Even after the termination of Biological Parents' rights, Kinship Parents allowed Biological Parents to have contact with Child whenever they desired.

A second, critical reason for the placement with Kinship Parents was their close proximity to the Biological Parents and Child's doctors. While we observe Paternal Grandparents' sincere effort to journey a considerable distance (approximately 90 minutes each way) to Child's appointments and visits, the dependency court's decision to keep Child within his community offered Child more stability and increased the likelihood of reunification with Biological Parents. Not only was the placement with Kinship Parents a proper choice, but it also appeared to be the only choice.

---

[2] "'Kin' is defined as an individual 21 years of age or older who is one of the following...An individual with a significant, positive relationship with the child or family." Although Kinship Parents might not have qualified as "kin" at Child's birth, by the time CYS became involved, Kinship Parents most certainly had a significant and positive relationship with both Child and Biological Parents. They were not mere babysitters.

Once the dependency case became court active, Paternal Grandparents still waited to become involved. They only sought a formal kinship placement in March 2016, six months after Child's adjudication. Paternal Grandparents only sought to intervene in the dependency case in September 2016, over a year after Child's adjudication. Paternal Grandmother contends that there was a delay after she sought visitation. However, the record merely reflects CYS had to obtain clearances from Paternal Grandparents in order to allow for contact with Child since CYS assumed legal custody of him upon the adjudication. None of CYS's actions could be construed as stonewalling Grandmother.

We do not pass judgment on Paternal Grandmother's limited involvement in comparison to Kinship Parents. One could assume they did all they could do. But Biological Father made a clear choice when he sought the help of Kinship Parents instead of his own parents.

Nonetheless, we emphasize that the goal of preserving the family unity cannot be elevated above all other factors. *See In re K.D.*, 144 A.3d at 153. On appeal, that is exactly what Paternal Grandmother asks us to do – to elevate her familial connection to Child to such a height that it negates the last five years' worth of best-interest evidence, all of which supports an adoption by Kinship Parents.

Finally, Paternal Grandmother argues the orphans' court erred when it failed to appoint an expert to evaluate what impact, if any, severing the relationship with Paternal Grandparent would have on Child. *See* Paternal

- 11 -

Grandmother's Brief at 7, 13. Although the expert psychologist testified about the impact of severing the relationship, Paternal Grandmother argues that the court should have granted her request for an updated bonding evaluation, since the last evaluation was conducted 18 months earlier. **See** N.T., 3/26/19 (Day 3), at 106-107.

In her brief, Paternal Grandmother provides no argument regarding the denied request. Instead, she couches the issue in a tangential matter: whether the trial court failed to consider the familial relationship. **See** Paternal Grandmother's Brief, at 13 (citing **In re Adoption of D.M.H.**, 682 A.2d 315; 319 (Pa. Super. 1996) (holding that the trial court did not fail to give enough weight to familial relationship in deciding the best interest of the child)).

In the instant case, the orphans' court clearly considered Paternal Grandmother's relationship with Child in determining Child's best interests. The orphans' court explicitly stated that it "recognizes that the familial relationship is a relevant consideration, but it is not the controlling consideration." T.C.O., 9/30/19, at 4 (not paginated). The court even went so far as to lament that it could not fashion an order to ensure Child would have some contact with Paternal Grandparents. **See** N.T., Day 5, at 180-181; **see also** 23 Pa.C.S. § 5326 ("Effect of adoption").[3] The court indisputably

---

[3] Section 5326 of the Child Custody Act provides: "Any rights to seek physical custody or legal custody rights and any custody rights that have been granted under section 5324 (relating to standing for any form of physical custody or legal custody) or 5325 (relating to standing for partial physical custody and

appreciated the gravity of its decision. But to Paternal Grandmother's specific objection – that the court did not grant her request for an updated evaluation – we conclude that the court's denial did not constitute an abuse of discretion for the following reasons.

For one, the court heard extensive expert testimony about Child and his relationships with both sets of petitioners and the nature of those bonds. The psychologist testified that it would be in Child's best interests to maintain both relationships. *See* N.T., 12/12/18 (Day 2), at 51. But he also testified that severing the relationship with Kinship Parents would be far more detrimental to Child. *Id.*, at 52-53. The parties then attempted to elicit from the psychologist whether his expert opinion had changed since the evaluation he conducted the previous year. *Id.*, at 52-56. The psychologist had not observed the family since and refused to entertain hypotheticals. *Id.*

Moreover, the orphans' court may even rely on lay evidence to discern a child's best interests. To explain, we observe the similar statutory language in the provision governing termination proceedings under the Adoption Act, 23 Pa.C.S.A. § 2511. Under Section 2511(b), wherein the court must conduct the second of a two-prong termination analysis, the primary consideration is the "developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). There, the court does not need to rely on expert

---

supervised physical custody) to a grandparent or great-grandparent prior to the adoption of the child by an individual other than a stepparent, grandparent or great-grandparent shall be automatically terminated upon such adoption."

testimony to evaluate the bond between a parent and child. ***See, e.g., In re Z.P.***, 994 A.2d 1108, 1121 (Pa. Super. 2010). Additionally, Section 2511(b) does not require a formal bonding evaluation. ***Id.*** (citation omitted). The court needs only to take into account whether a bond exists, and whether termination would destroy an existing, necessary and beneficial relationship. ***Id.*** Thus, the court may rely on lay testimony to determine whether termination is still warranted notwithstanding the existence of a bond.

Instantly, under the relevant adoption provision, the court must decide desirability of adoption on the basis of the "physical, mental and emotional needs and welfare of the child." 23 Pa.C.S. § 2724(b). We are loathe to equate the two provisions, notwithstanding the similarity of the language, because each provision governs a discretely different situation: the termination of parental rights on one hand, and the assumption of those rights on the other.

This case offers a clear illustration. The choice here is not whether to sever a beneficial bond, but which of the two beneficial bonds is worth preserving and which must be severed. Ideally, neither bond would be severed, per the expert's recommendation and the orphans' court's hope. Still, the court was tasked with that decision. Contrary to Paternal Grandmother's view, the law does not require a formal bonding evaluation to be conducted, much less an up-to-the-minute formal bonding evaluation. We do not require this in termination cases, and we conclude the same rule applies in this scenario, where adoptive families file competing petitions.

- 14 -

Instantly, the expert witness testified that it would be far more detrimental to sever the bond Child had with Kinship Parents. Although that recommendation was made some 16 months prior to his testimony, the orphans' court also heard extensive lay testimony about Child's life in the time since the evaluation. In fact, the court heard from both sets of petitioners, among others, about the relationship they had with Child, from his birth until the date in question. From this testimony, the court could extract a decision. That decision – to deny Paternal Grandmother's request to adopt child – was supported by the recorded and thus not an abuse of discretion.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/20/2019