J-S65026-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: W.P.J.K., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: J.K., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1026 MDA 2019 |

Appeal from the Decree Entered, May 30, 2019,
in the Court of Common Pleas of Berks County,
Orphans' Court at No(s):  86417.

| | | |
|---|---|---|
| IN RE: E.J.K., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: J.W.K., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1027 MDA 2019 |

Appeal from the Decree Entered, May 30, 2019,
in the Court of Common Pleas of Berks County,
Orphans' Court at No(s):  86416.

| | | |
|---|---|---|
| IN RE: K.J.K., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: J.K., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1028 MDA 2019 |

Appeal from the Decree Entered May 30, 2019

J-S65026-19

in the Court of Common Pleas of Berks County,
Orphans' Court at No(s): 86415.

BEFORE:   PANELLA, P.J., KUNSELMAN, J., and COLINS, J.*

MEMORANDUM BY KUNSELMAN, J.:               **FILED JANUARY 06, 2020**

J.W.K. (Father) appeals from the decrees entered by the Berks County Orphans' Court, which involuntarily terminated his parental rights to three of his children (four-year-daughter K.J.K, two-year-daughter E.J.K., and one-year-son W.P.J.K.) pursuant to the Adoption Act. [1] ***See*** 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8) and (b).  Upon review, we affirm.

The orphans' court summarized the factual and procedural history of this matter as follows:

> [Father] and [Mother] (collectively "Parents") are the natural parents of K.J.K. (born October [] 2014), E.J.K. (born January [] 2017) and W.P.[J.]K. (born January [] 2018) (collectively "the Children").  Mother and Father were not married when the Children were born.  Mother has three additional children who do not reside with her and Father has two additional children that do not reside with him.
>
> Berks County Children and Youth Services ("BCCYS") first engaged Parents and Children ("the Family") in 2013, though services were discontinued when Parents moved into Montgomery County.  In November of 2015, upon referral from BCCYS and the Family moving into Montgomery County, Montgomery County Children and Youth Services ("MCCYS")  became  involved  in  funding  services  and

---

* Retired Senior Judge assigned to the Superior Court.

[1] The orphans' court also terminated the parental rights of J.L.C. (Mother). She filed a separate appeal, which is also before this panel.

- 2 -

supervision of the case due to ongoing mental health, domestic violence and housing stability issues.

In 2017, upon referral from MCCYS indicating that the Family had moved back into Berks County, BCCYS was re-engaged with the Family in order to address ongoing issues with both Mother and Father. After several months within which several incidents and continuing issues prompted safety plans from BCCYS, but the safety plans were repeatedly broken. On October 12, 2017, BCCYS filed an emergency petition for custody of K.J.K. and E.J.K. that was granted by the court. BCCYS then filed a dependency petition for K.J.K. and E.J.K., and upon a hearing before this court, legal custody was transferred to BCCYS for placement purposes. The primary established goal was return of K.J.K. and E.J.K. to the most appropriate parent with a concurrent goal of adoption.

Mother gave birth to W.[P.]J.K. [i]n January [] 2018. After no reported prenatal care and both Mother and W.[P.]J.K. tested positive for methamphetamines, BCCYS filed a petition on March 13, 2018 seeking dependency of W.[P.]J.K. The court ordered that W.[P.]J.K. would remain with Parents as he was still hospitalized, but also ordered that foster parents were allowed to visit W.[P.]J.K. due to Parents' inconsistent visits. Upon his discharge from the hospital, BCCYS filed for emergency custody of W.[P.]J.K. and after a hearing, legal custody was transferred to BCCYS on March 28, 2018.

[***]

On October 31, 2018, [BCCYS] filed a petition for the involuntary termination of the parental rights of both Mother and Father pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (8). The petition cited the same following factual support for grounds for termination:

   a. Failure of Mother and Father to obtain and maintain a legal/stable source of income;

   b. Failure of Mother and Father to obtain and maintain stable and appropriate housing;

   c. Inability of Mother and Father to appropriately parent the Children;

> d. Failure of Mother and Father to show progress with parenting skills;
>
> e. Failure of Mother and Father to remediate substance abuse issues;
>
> f. Concerns remaining regarding Mother's and Father's mental health; and
>
> g. Concerns remaining regarding issues of domestic violence.
>
> A hearing on the petition was held on May 13, 2019 and continued for a second day on May 23, 2019.
>
> [***]
>
> Upon conclusion of the hearing, the court took the matter under advisement. Thereafter, [the court] filed separate orders dated May 30, 2019 terminating the parental rights of both Mother and Father as to K.J.K., E.J.K., and W.[P.]J.K.

Trial Court Opinion, 8/15/19, at 1-16 (citations to the record omitted).

Father filed this timely appeal, wherein he presents two interconnected issues for our review:

> 1. Whether the orphans' court erred in involuntarily terminating Father's parental rights between K.J.K. and him, where there was a strong emotional and parental bond between him and K.J.K., which would have had a negative effect on the child if the parental bond was permanently severed?
>
> 2. Whether the orphans' court erred in involuntarily terminating Father's parental rights to W.P.J.K. and E.J.K., where there was a strong emotional and parental bond between Father and K.J.K., which would have a negative effect on the younger children if the bond was permanently severed and it would be detrimental to sever the ties between the three children who are extremely bonded as siblings?

Father's Brief at 5. (Edited for clarity.)

Initially, we note Father's second issue depends on the success of his first. Father all but concedes he does not have a strong parental bond with the younger children (E.J.K. and W.P.J.K.). But, he argues, the younger children's sibling bond with the eldest child (K.J.K.) is so essential that if his rights to K.J.K. should not be terminated, neither should his rights to the E.J.K. and W.P.J.K.

We begin with our well-settled standard of review:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re Adoption of A.C.*, 162 A.3d 1123, 1128 (Pa. Super. 2017) (quoting *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

Termination of parental rights is governed by section 2511 of the Adoption Act, which requires a bifurcated analysis:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants

termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

The petitioner must prove by clear and convincing evidence that the asserted statutory grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009).

When terminating parental rights under section 2511(a), this court has stated that the focus is on the parent; but under section 2511(b), the focus in on the child. *See In re Adoption of C.L.G.*, 956 A.2d 999, 1008 (Pa. Super. 2008) (*en banc*). In reviewing the evidence in support of termination under section 2511(b), our Supreme Court has stated as follows:

[I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, section 2511(b) does not require a formal bonding

evaluation." ***In re Z.P.***, 994 A.2d 1108, 1121 (Pa. Super. 2010) (internal citations omitted). Although it is often wise to have a bonding evaluation and make it part of the certified record, "[t]here are some instances…where direct observation of the interaction between the parent and the child is not necessary and may even be detrimental to the child." ***In re K.Z.S.***, 946 A.2d 753, 762 (Pa. Super. 2008).

A parent's abuse and neglect are also a relevant part of this analysis. ***See In re K.K.R.-S.***, 958 A.2d 529, 535 (Pa. Super. 2008). Thus, the court may emphasize the safety needs of the child. ***See In re K.Z.S.***, 946 A.2d at 763 (affirming involuntary termination of parental rights, despite existence of some bond, where placement with mother would be contrary to child's best interests). "[A] parent's basic constitutional right to the custody and rearing of … her child is converted, upon the failure to fulfill … her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." ***In re B.,N.M.***, 856 A.2d 847, 856 (Pa. Super. 2004) (internal citations omitted).

Instantly, Father limits his appeal to the second prong of the termination analysis, section 2511(b).  Thus, we accept the orphans' court determination that termination was warranted under section 2511(a)(1), (2), (5) and (8), and we narrow our focus on section 2511(b).  Regarding section 2511(b), Father argues that he regularly visited K.J.K. during the dependency case, and that during those visits, he demonstrated appropriate parenting by completing such tasks as feeding and diaper changing.  He highlights the testimony of a

MCCYS caseworker who opined that Father cared for Children and did a good job with them. Similarly, Father directs us to the testimony of another service provider, who stated that K.J.K. is attached to Father. Finally, Father argues that since he ended his relationship with Mother, he has placed himself in a position where he could care for the Children full-time. *See* Father's Brief at 11-12.

Regarding the section 2511(b) analysis, we observe that the orphans' court made extensive findings to support its ultimate determination that termination of Father's rights was warranted:

> Dr. Richard Small, who was qualified as an expert in the field of psychology, testified that he performed forensic valuations of both Father and Mother. Dr. Small's evaluation of Father performed in March of 2018 and Father presented as exhibiting self-centered and anti-social behavior. Dr. Small noted that Father's relationship with Mother included verbal and physical violence, including a PFA, and that the relationship between the two was difficult. Father admitted no issues and indicated that any problems were the fault of other people without accepting any responsibility of his own.
>
> In relation to Father's prospect of change, Dr. Small opined that he sees Father's prospect of change as "not very good," due to Father's personality disorder and because Father maintains that he has done nothing wrong and viewing himself as superior to others. Initially, Father refused to admit any drug use, but then slowly provided further details on his drug use. When Dr. Small asked how Father could maintain clean urine samples, Father indicated that he knew how to game the system. Further, Father demonstrated no view of problematic drug use other than perhaps the legal consequences arising therefrom.
>
> [***]

Dr. Small opined that he had great concern regarding the combustible relationship between Father and Mother and the negative effect on the needs of the Children. Dr. Small further indicated that it is common to observe intermittent periods of engagement with individuals in which it appears that the individuals are cooperating and recognizing issues, but then the progress falls apart. When it came to the Children, Dr. Small noted that Father spoke about the Children with affection, while Mother was much more focused on herself without much mention of the Children. However, Dr. Small concluded that he had strong doubts as to whether Father or Mother could provide a consistent safe, nurturing and stable environment for the Children.

[***]

After issues with Parents arriving late for visitation appointments, BCCYS implemented and the court later ordered, the Parents arrive one hour prior to the visitation appointments. As was noted, both Parents missed or cancelled appointments throughout. When Father requested separate visitation times, visitation was reduced from twice a week for two hours with both Parents to once a week for two hours with Mother and the same with Father.

[The permanency and adoption supervisor with BCCYS] noted that K.J.K. demonstrated no negative effects resulting from the reduction in visitation time. K.J.K. does not ask for Parents while at the home of foster parents between visitation periods and there is no indication of effect or statements from K.J.K. when Parents have cancelled or failed to show up for visitation appointments.

[***]

[The permanency and adoption supervisor with BCCYS] indicated that she saw no detriment to the Children in terminating parental rights. W.[P.]J.K. has been in the care of the foster parents since shortly after his birth and is primary attached to the foster parents. E.J.K. has formed a secure attachment to the foster parents, seeking and receiving comfort, support and fulfillment of her needs. K.J.K. has expressed that she didn't want to go back to the foster home or daycare following some visits, but she is easily redirected and is responsive to the comfort. K.J.K. refers to foster parents as mom and dad.

[The permanency and adoption supervisor with BCCYS] explained that BCCYS is seeking termination of parental rights due to the age and vulnerability of the Children, the length of time within which Parents have been afforded the opportunity to engage in services, the span of the case across two counties and the lack of progress and consistency from Parents. The needs of the Children for stability in living arrangements and in environment and the need for consistent and stable caregiving demonstrate that termination of parental rights is in the best interests of the Children.

[Legal Counsel for the Children] testified that he had the opportunity to meet with foster parents and with the Children. Legal Counsel observed the foster parents to [be] engaging, caring and attentive to the needs of the Children and indicated that the foster parents share an attachment with the Children. Since E.J.K. and W.[P.]J.K. were too young to engage in dialogue with Legal Counsel, he had a conversation with K.J.K. K.J.K. told Legal Counsel that she loves the foster parents, but indicated to Legal Counsel that she wanted to live with "old mommy and daddy," meaning Parents.

[The GAL for the Children] testified that in reviewing the reports, it is reported that K.J.K., though crying when she needed to leave visits with Parents, also cried when she was dropped off by the foster mom. K.J.K. loves both Parents and foster parents. K.J.K. did not indicate to the GAL a preference of where she wanted to live. The GAL observed a strong bond between K.J.K. and the foster parents and noted the stability that foster parents offer in relation to the lack of stability K.J.K. had experienced with Parents. The GAL also expressed the importance of keeping K.J.K. with her siblings. The GAL concluded that it is in the best interests of the Children to terminate the parental rights of both Mother and Father, indicating that the bond with the foster parents is healthier and much more critical than that with Parents.

T.C.O. at 8-16 (citations to the record omitted).

- 10 -

These findings, which are supported by the record, reveal that Father's arguments are without merit. Father claims he maintained and formed parental bonds through visitation. The record reveals that his visitation was not consistent. Even if it were, the record also shows that visitation alone did not nurture a parental bond worth preserving. By not appealing the first prong of the termination analysis, Father concedes that he was unable to parent the Children. What he fails to realize is that because he could not parent the Children, they began to form primary attachments to their primary caregivers, the foster parents. In other words, even the most consistent visitation would not necessarily prevent the Children from becoming bonded to foster parents.

We certainly recognize an atypical facet of this case, namely, that the four-year-old K.J.K. had somewhat conflicting interests. In terms of her legal interests, *i.e.*, her preferred outcome,[2] she expressed a desire to return to her biological parents' care. But on the other hand, K.J.K.'s best interests mandated that she remain safe and secure with the foster parents. On this point, we note that K.J.K.'s preference to return to Father was not exactly unequivocal. She demonstrated distress when she left the care of whichever parent (foster or biological) she was with. She referred to both sets as "mom and dad." She indicated that she had love for both sets, as well. Had there

---

[2] In **In Re Adoption of L.B.M.**, 161 A.3d 172 (Pa. 2017) a fractured Pennsylvania Supreme Court interpreted 23 Pa.C.S.A. § 2313(a) to mean that a child involved in a contested termination hearing must be afforded counsel to represent her "legal interests," or preferred outcome of the litigation. We note that K.J.K. was represented by separate legal counsel in this case.

been evidence that K.J.K.'s success in the foster parents' home would be jeopardized by her strong desire to return to Father's care, then the conflict between her "best interests" and her "legal interests" would be more concerning. But because the record clearly indicates that K.J.K. was also strongly bonded to the foster parents, the record supports the orphans' court determination that K.J.K.'s legal interests (to live with Father) did not outweigh her best interests (to remain with the foster parents).

K.J.K.'s legal interests aside, Father argues that it was in K.J.K.'s best interests to deny the termination, because she had a "strong bond" with Father. Father's Brief at 12. Whether K.J.K. did, in fact, share a strong bond with Father is debatable, but even if their bond was strong, it was not the type worth preserving.

To explain:

> When examining the effect upon a child of severing a bond, courts must examine whether termination of parental rights will destroy a "necessary and beneficial relationship," thereby causing the child to suffer "extreme emotional consequences." (Citation omitted). In the case of an unhealthy bond, "attention must be paid to the pain that inevitably results from breaking a child's bond to a biological parent, even if that bond is unhealthy, and we must weigh that injury against the damage that bond may cause if left intact. *In re T.S.M.*, [*supra*] 71 A.3d 251, 267 (Pa. 2013).

*In re Adoption of J.N.M.*, 177 A.3d 937, 944 (Pa. Super. 2018).

We also note that courts may consider the totality of the circumstances when performing the needs and welfare analysis under section 2511(b).

- 12 -

***J.N.M.***, 177 A.3d at 946 (citing ***In re Coast*** 561 A.2d 762, 771 (Pa. Super. 1989) (*en banc*)).

Instantly, Father has evinced an inability to parent. Even if the orphans' court was inclined to deny the termination petition, Father would not even be in a position to enjoy unsupervised visitation, much less reunification with K.J.K. K.J.K.'s instability would persist, which, in turn, would result in detrimental consequences. Thus, the bond K.J.K. shares with Father is clearly an unhealthy one. The only remaining question is whether K.J.K. would suffer an injury if this unhealthy bond was severed.

The record supports the orphans' court determination that K.J.K. would not. Although she was upset after leaving her visits with Father, she was easily redirected and responsive to the foster parents' comfort. K.J.K. did not ask about Father either between visits or when those visits were cancelled for Father's failure to show up. She experienced no negative consequences with her visits with Father were reduced. Importantly, K.J.K. also has a bond with foster parents, one that is much more stable and secure.

Because we conclude that termination of Father's rights to K.J.K. was warranted, we need not discuss Father's second issue, the hypothetical effect that splitting up the siblings would have on their respective best interests. However, we note that "the goal of preserving the family unit cannot be elevated above all other factors when considering the best interests of the children, but must be weighed in conjunction with other factors." ***In re K.D.***,

144 A.3d 145, 153 (Pa. Super. 2016) (citing *In re Adoption of G.R.L.*, 26 A.3d 1124, 1127 (Pa. Super. 2011).

In sum, the record supports the thorough and extensive findings made by the orphans' court. Thus, we conclude that the orphans' court did not commit an abuse of discretion when it granted the termination petition filed by BCCYS.

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 01/06/2020