J-S22032-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT OP 65.37**

| | | |
|---|---|---|
| IN RE: THE ADOPTION OF: D.L.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: C.M., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 183 WDA 2023 |

Appeal from the Order Entered January 11, 2023
In the Court of Common Pleas of Westmoreland County
Orphans' Court at 34 of 2022

| | | |
|---|---|---|
| IN RE: THE ADOPTION OF: J.L.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: C.M., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 184 WDA 2023 |

Appeal from the Order Entered January 11, 2023
In the Court of Common Pleas of Westmoreland County
Orphans' Court at 35 of 2022

| | | |
|---|---|---|
| IN RE: THE ADOPTION OF: E.J.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: C.M., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 185 WDA 2023 |

Appeal from the Order Entered January 11, 2023
In the Court of Common Pleas of Westmoreland County
Orphans' Court at 036-2022

| | | |
|---|---|---|
| IN RE: THE ADOPTION OF: B.L.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |

J-S22032-23

<table>
<tr><td></td><td>:</td><td></td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td>APPEAL OF: C.M., MOTHER</td><td>:</td><td></td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td></td><td>:</td><td>No. 186 WDA 2023</td></tr>
</table>

Appeal from the Order Entered January 11, 2023
In the Court of Common Pleas of Westmoreland County
Orphans' Court at 037-2022

BEFORE:  OLSON, J., STABILE, J., and MURRAY, J.

MEMORANDUM BY MURRAY, J.:                    **FILED: AUGUST 1, 2023**

C.M. (Mother) appeals from the order granting the petition of Westmoreland County Children's Bureau (Agency) for termination of her parental rights to D.L.S., J.L.S., E.J.S., and B.L.S. (Children).[1]  We affirm.

<u>CASE HISTORY</u>

The orphans' court recounted the factual and procedural history prior to the Agency filing the termination petition on June 1, 2022.  The orphans' court stated:

> The minor children, [D.L.S.] (born June [], 2020), [J.L.S.] (born September [], 2018), [E.J.S.] (born September [], 2017), and [B.L.S.] (born August [], 2016), were born to [Father] (age 36) and [Mother] (age 31).  Mother has an older son named [Da.,] who is not a party to these proceedings.  The parties have never been married.
>
> **The [Agency] began working with this family in June of 2019, after numerous referrals were received regarding lack of supervision, poor housing conditions, lack of**

_____

[1] The orphans' court also terminated the parental rights of the Children's father, B.T.S. (Father), who has not appealed.

- 2 -

**discipline, and illegal drug use by Mother and Father**. The [Agency] filed a Dependency Petition on August 17, 2020, alleging lack of supervision for the [C]hildren and illegal drug use. There was a specific incident in which Mother had fallen asleep while the [C]hildren were in the bathtub and emergency custody was taken. Father was not present at the time. [Mother's older son, Da.,] was not at the home when emergency custody was taken and he was not removed from [Mother's] care.

An Adjudication and Disposition Hearing was held on August 28, 2020, and [C]hildren were found to be dependent. Mother [was] ordered to undergo a drug and alcohol evaluation; undergo a mental health/psychiatric evaluation and comply with any recommended treatment; undergo random drug screens; participate in a parenting assessment and complete any recommended parenting instruction; participate in life skills services; obtain and maintain stable and appropriate housing; and secure and maintain a verifiable and legal source of income.

A Permanency Review Hearing was held on February 8, 2021. **Mother was found to have moderate compliance with the permanency plan[, yet] minimal progress towards alleviating the circumstances which le[]d to [C]hildren's placement**. …

[Mother was] ordered to continue drug and alcohol treatment; comply with random drug screens; continue mental health treatment; participate in a parenting assessment; participate in parenting instruction; maintain adequate housing and employment; and participate in life skills services.

A Permanency Review Hearing was held on August 9, 2021. **Mother had substantial compliance with the permanency plan[, yet] made minimal progress towards reunification**. Mother was successfully discharged from [Southwestern Pennsylvania Human Services (SPHS),] and did a parenting assessment. The assessment showed Mother was at high risk for child maltreatment due to her high distress. Mother received hands-on parenting [support] at visits and continued to struggle with nutrition and supervision. Mother lost housing during the review period and moved into a three-bedroom apartment. While Mother did not provide documenta[tion] of mental health treatment, she was reportedly attending Kreinbrook for treatment. … Providers reported that [Mother] made no

substantial progress with [] parenting skills during the review period. [Mother was] ordered to continue with the previously court-ordered services.

A third Permanency Review Hearing was held on February 14, 2022. **Mother had moderate compliance with the permanency plan[, yet] made minimal progress towards reunification**. Providers were concerned for Mother's marijuana use, although she had a medical marijuana card. Mother regularly attended visits and treatment. … Monitored visits were attempted but went back to supervised because of safety concerns and the visits being chaotic. [Mother] continued to struggle with understanding, retaining and implementing parenting instruction. …

[Mother] continued to have supervised visits three times a week with the Children's Institute; parenting and life skills through the Children's Institute; and couples counseling through Catholic Charities. [Mother was] ordered to continue all previously court-ordered services until successful completion.

The fourth Permanency Review Hearing was held on May 16, 2022. **Mother had substantial compliance with the permanency plan[, yet] made minimal progress towards reunification**. Mother continued to receive drug and alcohol treatment and participate in parenting sessions. Mother had a mental health evaluation and was recommended weekly therapy. **She continued to struggle with retaining parenting information and there were numerous safety concerns over the review period**. …

Orphans' Court Opinion, 1/11/23, at 3-6 (emphasis added).

On June 1, 2022, the Agency petitioned for termination of Mother's parental rights. The Agency also petitioned for termination of Father's parental rights. The orphans' court held a termination hearing as to both parents over the course of five days, on October 6, 20, and 28, 2022, November 22, 2022, and December 9, 2022.

On January 11, 2023, the orphans' court entered an opinion and order terminating Mother and Father's parental rights. As noted, Father did not appeal. Mother timely filed a notice of appeal at each of the four Children's dockets, as well as a concise statement of errors complained of on appeal. On February 13, 2023, the orphans' court filed an order stating the "rationale behind the [orphans' c]ourt's Order can be found in the Order of Termination filed on January 11, 2023." Order Pursuant to Pa.R.A.P. 1925(a). This Court consolidated the appeals *sua sponte* on February 27, 2023.

<u>ISSUES</u>

Mother presents the following eight questions:

I.      Whether the Honorable Trial Court erred in finding by clear and convincing evidence that the moving party met its burden as to terminating the parental rights of Mother under 23 Pa.C.S. § 2511(a)(2)[?]

II.     Whether the Honorable Trial Court erred in finding by clear and convincing evidence that the moving party met its burden as to terminating the parental rights of Mother under 23 Pa.C.S. § 2511(a)(2)(5)[?]

III.    Whether the Honorable Trial Court erred in finding by clear and convincing evidence that the moving party met its burden as to terminating the parental rights of Mother under 23 Pa.C.S. § 2511(a)(8)[?]

IV.     Whether the Honorable Trial Court erred in finding by clear and convincing evidence that the moving party met its burden under 23 Pa.C.S. §2511(b) that the best interests of the Child are met by terminating Mother's parental rights[?]

V.      Whether the Honorable Trial Court erred in terminating Mother's parental rights despite the establishment of a bond between Mother and Child, and despite the fact that many

- 5 -

of the conditions which led to removal of the Child have been alleviated by Mother[?]

VI.     Whether the Honorable Trial Court erred in terminating Mother's parental rights, despite Mother's consistently high level of compliance with Court-Ordered services throughout the history of the case[?]

VII.    Whether the Honorable Trial Court erred in terminating Mother's parental rights to child[ren,] B.L.S. and J.L.S., given that the [Agency] proffered testimony by its lone expert witness stating that he could not recommend termination of [Mother's] rights to B.L.S. and J.L.S[?]

VIII.   Whether the Honorable Trial Court erred in terminating Mother's parental rights, given the Agency's failure to provide Court-Ordered [Parent/Child Interactional Therapy (PCIT)] for child B.L.S[?]

Mother's Brief at 4-5.

In her argument, Mother combines her eight questions into three issues.

*See* Mother's Brief at 26, 45, 49. Like Mother and the Agency, we address

Mother's issues as follows:

I.      [Whether t]he Agency met its burden by clear and convincing evidence that Mother's parental rights should be terminated under 23 Pa.C.S. § 2511(a)(2), (a)(5), or (a)(8)[?]

II.     [Whether t]he Agency met its burden by clear and convincing evidence that termination of Mother's parental rights would be in the best interests of [C]hildren under 23 Pa.C.S. § 2511(b)[?]

III.    [Whether the Orphans'] Court … err[ed] in terminating Mother's parental rights to Children B.L.S. and J.L.S. given that the Agency proffered testimony by its lone expert witness[, Dr. Neil Rosenblum,] recommending PCIT therapy for two of the Children, and] stating that he could not recommend termination of [Mother's] rights to B.L.S. and J.L.S.[?]

*Id.*; Agency's Brief at ii.[2]

Mother argues the Agency failed to establish clear and convincing evidence to support termination. Mother's Brief at 25. She maintains the evidence was not clear and convincing because: "All parties, service providers, evaluation providers, and the [orphans' c]ourt agree that Mother performed virtually all the services and evaluations that were asked of her or ordered by the [c]ourt." *Id.*

> Conversely, the Agency argues:
>
> Although [Mother] was found to have moderate and later substantial compliance with the permanency plan at each Permanency Review Hearing, she was found to have made minimal progress in alleviating the circumstances which necessitated the original placement[,] as she displayed numerous parenting deficits in nutrition, supervision, and safety.

Agency's Brief at 3.

We review the termination of parental rights for an abuse of discretion.

*In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012).

> [O]ur standard of review requires [us to] accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported,

---

[2] Children's guardian *ad litem*, Emily K. Trisoline, Esquire, has advised of her "joinder in the Brief of the [Agency]." Letter, 5/3/23. Attorney Trisoline stated she would "not be submitting an independent brief for consideration." *Id.*

Andrew F. Skala, Esquire, the attorney representing the legal interests of two of the Children, advised he would "not be filing an Answer to [Counsel's] Brief for Appellant." Letter, 5/5/23. Attorney Skala stated that his decision "should not be construed as a concurrence or concession to [Mother's] position." *Id.*

appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

As [the Supreme Court] discussed in *In re: R.J.T.*, [9 A.3d 1179, 1190 (Pa. 2010)], there are clear reasons for applying an abuse of discretion standard of review …. [U]nlike trial courts, appellate courts are not equipped to make fact-specific determinations on a cold record, where trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead, we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*Adoption of S.P.*, 47 A.3d at 826-27 (some citations omitted). The petitioner has the burden to provide clear and convincing evidence that its asserted grounds for termination are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009).

I.  Section 2511(a) – Grounds for Termination

Mother argues the orphans' court erred in terminating her parental rights under Subsections 2511(a)(2), (5), and (8). We need only agree with the orphans' court as to any one Subsection of Section 2511(a), as well as Subsection (b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en*

*banc*).    Instantly, we examine Mother's challenge under Subsection 2511(a)(2).  Subsection 2511(a)(2) provides for termination when:

> The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A. § 2511(a)(2).

To satisfy these requirements, the petitioner must prove "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In re A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021) (citation omitted).  Grounds for termination "are not limited to affirmative misconduct, **but concern parental incapacity that cannot be remedied**." *Id.* (emphasis added).

In addressing Subsection 2511(a)(2), Mother assails the credibility of Alicia Gilbert, a service provider with the Children's Institute, who "testified that she continues to have safety concerns for the children."  Mother's Brief at 35.  Mother states:

> Ms. Gilbert relied on alleged safety incidents which happened months prior to the filing of the termination petitions[, and] testified that she does not have current safety concerns, but then clarified that it is only because the visits are supervised and interventions can quickly be made by service providers.

*Id.*

Mother references the testimony of Nacia Gibbs, a service provider with the Bair Foundation, who supervised Mother's visits between October and December 2022. Mother claims Ms. Gibbs "has been noting progress on Mother's part, [which] calls into question Ms. Gilbert's testimony." *Id.* at 36. She adds that "Ms. Gilbert's credibility is further compromised by some of her nit-picking comments and testimony." *Id.*

Mother emphasizes that "Ms. Gibbs did not note any safety concerns for [C]hildren or any issues with [Mother's] manner of parenting" during the four visits she supervised. *Id.* at 37. According to Mother, Ms. Gilbert's successor, Ms. Sluka, "agreed the visits were fine and there were no safety issues." *Id.* at 37-38. Mother states, "even if this Honorable Court would conclude that the [orphans' c]ourt was correct in its assessment that safety or supervisory concerns are ongoing, the testimony of Ms. Gibbs clearly establishes that Mother is very close to remedying any deficiency." *Id.* at 39.

The Agency responds that although Mother complied with her permanency plans, "**she was found to have made minimal progress in alleviating the circumstances which necessitated the original placement[,] as she displayed numerous parenting deficits in nutrition, supervision, and safety**." Agency's Brief at 3 (emphasis added).

The orphans' court, referencing the expert testimony of psychologist Neil Rosenblum, observed:

> Dr. Rosenblum diagnosed Mother with depression, anxiety, and cannabis use disorder, among other diagnoses. She exhibited

- 10 -

borderline personality traits and struggles developing a personal identity. Dr. Rosenblum does not believe Mother has made significant progress with her mental health and she is struggling to cope with her current situation.

Orphans' Court Opinion, 1/11/23, at 10.

The orphans' court further explained:

Children were removed from the care of [Mother] in August of 2020, when an Agency caseworker came to the home and the Children were running water in the bathtub while Mother was asleep. …

Throughout the Children's placement, safety issues have continued to be noted almost regularly. [Mother] progressed to monitored visits for a short period of time on two occasions but reverted back to supervised visits because of the safety concerns. Even after service providers assisted [Mother] with child-proofing the[] home, safety concerns continued.

Providers repeatedly saw the Children run away from [Mother] and run near the steps inside or outside of the home. The Children would pick things up off the ground and put them in their mouths. The Children suffered minor injuries during visits, such as [E.J.S.] getting a small burn from the oven. Providers witnessed [J.L.S.] push [E.J.S.] off the top bunk bed and [D.L.S.] fall from his highchair. There were several near falling, burning, or choking incidents. On one occasion, the television almost fell on [D.L.S.] and had to be stopped by a service provider. A visit which occurred on April 18, 2022, ended early after providers found a marijuana roach on the couch. During a monitored visit, the Children were permitted to urinate outside and run around naked.

… While visits have improved in the past few months, the improvement could be attributable to the visits occurring at the Children's Institute as opposed to Mother's residence. Visits also appear to be less chaotic when the Children's visits are split up and all five children are not together. … [Mother has] demonstrated inappropriate parenting skills even when there are fewer Children present.

Additionally, nutrition has been an ongoing issue. There were numerous visits at which [E.J.S.] was given candy or food that she cannot have due to her dental work. …

\*\*\*

Mother [has] demonstrated a repeated and continued incapacity which has caused the Children to be without essential parental care and control necessary for their well-being. Service providers have discussed supervision and safety with [Mother] on numerous occasions, yet visits have continued to be chaotic since the Children were removed. Even recently in October [2022], Nacia Gibbs had to intervene and redirect [Mother].

Mother has not demonstrated the ability to routinely and adequately supervise all four Children. Despite the lengthy testimony regarding the safety concerns witnessed by providers, Mother testified that she does not believe there are major concerns during visits …. Mother clearly does not understand the severity of the safety issues witnessed during visits. … Thus, it is unlikely that this incapacity will be remedied by Mother[.]

Orphans' Court Opinion, 1/11/23, at 35-37.

The record supports the orphans' court's determination that Mother's repeated and continued incapacity to parent has caused Children to be without essential parental care that cannot or will not be remedied, as provided in Subsection 2511(a)(2). We must "accept the [orphans' court's] findings of fact and credibility determinations … so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion." *In re Adoption of S.P.*, 47 A.3d at 826-27. Accordingly, Mother's argument regarding grounds for terminating her parental rights under Section 2511(a)(2) does not merit relief.

## II.   Section 2511(b) – Needs and Welfare

If the court determines termination is warranted under Subsection 2511(a), it must then consider Children's needs and welfare:

> The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.   The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  …

23 Pa.C.S.A. § 2511(b).

This Court has stated repeatedly that "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted).  The orphans' court "must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *Id.* (citation omitted).  The court "should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child." *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011).  Nonetheless,

> in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. Accordingly, **the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case**.

> Importantly, **the question is not merely whether a bond exists, but whether termination would destroy this existing, necessary and beneficial relationship**.

- 13 -

*In re A.H.*, 247 A.3d at 444–45 (citations omitted, emphasis added).

Mother argues the Agency "did not present sufficient evidence and the [orphans' c]ourt did not make specific findings of the impact on [C]hildren of the severing of these important and beneficial bonds." Mother's Brief at 25. Mother states there "is obviously a bond between [Mother] and [C]hildren." *Id.* at 47. According to Mother, Dr. Rosenblum "noted many of the same bond type behaviors between [Mother] and [C]hildren when he performed his two interactional evaluations …." *Id.* She states, "all the visitation supervisors who testified concede that [C]hildren interact with [Mother] at visits, are excited to see [Mother], and give hugs and kisses to [her]." *Id.* Mother emphasizes that E.J.S., B.L.S. and J.L.S. expressed their desire "to return home to" Mother. *Id.* at 46. Finally, Mother claims the orphans' court "should have addressed … the severing of the bond between the four [C]hildren and their brother D.[a.]." *Id.* at 48.

The Agency argues otherwise. Agency's Brief at 21-26; *id.* at 22 (citing *In re Adoption of G.R.L.*, 26 A.3d 1124, 1127 (Pa. Super. 2011) (stating "although the preservation of the family is the desired outcome … the goal of preserving the family unit cannot be elevated above all other factors when considering the best interests of the child[ren], but must be weighed in conjunction with other factors.")). The Agency cites Dr. Rosenblum's testimony in asserting: "While there may be a bond between [Mother] and the Children, the need for stability, safety and permanency is more important than

- 14 -

any bond between a parent and a child." Agency's Brief at 26; *id.* at 22-26 (discussing Dr. Rosenblum's testimony about his assessment of the Children's emotional, developmental and educational needs, and their attachment to Mother and their foster parents).

The parties agree that Children have been dependent and in the custody of the Agency for approximately three years. *See* Mother's Brief at 7 (stating the "4 children were placed into Agency custody on or about August 3, 2020."); Agency's Brief at 3 (stating Children "were adjudicated dependent on August 28, 2020"). In considering Children's needs and welfare, the orphans' court opined:

> Terminating parental rights is in the Children's best interests and supports the developmental, physical and emotional needs and welfare of the Children. The Children are in need of permanency and the possibility of reunification in the near future is minimal. While [B.L.S.] and [J.L.S.] have been placed in multiple foster homes, their developmental, physical and emotional needs cannot be met by [Mother]. [E.J.S.] and [D.J.S.] are bonded with their foster family and removing them from this family would not be in their best interests.

Orphans' Court Opinion, 1/11/23, at 44.[3]

The orphans' court noted the "limited testimony" of the two older children, B.L.S. and E.J.S., who were ages 6 and 5 at the time of the hearing.[4]

---

[3] The Agency points out that B.L.S. and J.L.S. were placed in a pre-adoptive foster home on November 6, 2022. *See* Agency's Brief at 26 (record citation omitted) (stating, "To date, [] B.L.S. and J.L.S. remain in that pre-adoptive foster home and they are thriving as well.").

[4] J.L.S., age 4, and D.L.S., age 2, did not testify.

*Id.* at 24.  The court relayed that B.L.S. enjoyed visits with Mother and "felt

sad when visits are over"; the court stated that E.J.S. "feels sad when leaving

visits but is happy to go back to her foster mother."  *Id.*

Pertinently, the orphans' court explained:

[Mother has] remained unable to adequately provide for the developmental needs of the Children.  While none of the Children are currently school-aged, various service providers were concerned that the Children were developmentally delayed when they came into placement.  While Mother … took [E.J.S.] to her hematology appointments and facilitated her blood transfusion prior to placement, providers have concerns that [Mother does] not fully understand the extent of [E.J.S.'s] medical issues. During the evaluation with Dr. Rosenblum, [Mother] said [E.J.S.] had no developmental delays, which was inaccurate.  …

[E.J.S.] and [D.L.S.] were both developmentally delayed when they came into the care of the[ir pre-adoptive foster parents,] and [the foster mother] taught [E.J.S.] sign language to assist with her communication.  The [foster parents] had [D.L.S.] in physical therapy and occupational therapy to help his fine motor coordination.  [Foster mother] uses educational games and activities to promote the Children's learning.  Throughout their placement with [foster parents], [E.J.S.'s] speech has greatly improved and [D.L.S.] has made developmental progress.  …

[E.J.S.] has medical appointments regularly and sees an audiologist multiple times a year for her hearing aids.  The [foster parents] have texted Mother and let her know about appointments but Mother has only attended one of these appointments.  The [foster parents] have consistently worked with [E.J.S.] in a way that is appropriate for her development and they regularly take her to all appointments.  Mother has failed to fully understand [E.J.S.'s] developmental needs and has not attended medical appointments that would shed light on [E.J.S.'s] development.

[E.J.S.] and [D.L.S.] have a strong bond to the [foster] family and it would be detrimental to their wellbeing if they were removed from their foster home.  Various service providers have reported that [E.J.S.] is extremely attached to foster mother, and literally clings to her around others.  [E.J.S.] and [D.L.S.] call the

[foster parents] "mommy" and "daddy." They often seek [the foster parents] for comfort and affection. [D.L.S.] was placed with [foster parents] when he was only a few months old. Dr. Rosenblum's opinion was that [D.L.S.] would not remember living with [Mother].

[B.L.S.] and [J.L.S.] have been placed in multiple foster homes since they were removed from [Mother]. When the boys were evaluated by Dr. Rosenblum, he concluded that their behavioral problems were due to a lack of permanency since the boys, particularly [B.L.S.], were having trouble understanding their identity within a foster home that was not pre-adoptive. The boys have continued to exhibit behavioral issues … [J.L.S.] and [B.L.S.] need a permanent home, as they are at risk for having adjustment disorder and it is unlikely that reunification will occur in the near future since [Mother has] not made meaningful progress and ha[s] not progressed past monitored visits.

Additionally, [J.L.S.] has had to undergo some medical testing in the past year to determine his development. While the foster parents let Mother know when these medical appointments are scheduled for, [she has not] attended medical appointments for [J.L.S.] or [B.L.S.] since their removal.

[Mother] clearly love[s] Children. There is affection witnessed by providers at every visit and [Mother] regularly tell[s] Children that [she] love[s] them. The Children seem to enjoy visits and spending time with [Mother]. There are also times when the Children want visits to end early or ask to be returned to their foster parents. When the Children were first removed from [Mother's] care, [E.J.S.] asked on at least two occasions if she could go back home [to Mother]. However, various service providers, including Dr. Rosenblum, believe [E.J.S.] and [D.L.S.] are now strongly attached to their foster parents. [E.J.S.] often asks [foster mother] if she [has] to go to visits [with Mother] and has behavioral issues before and after visits.

The Supreme Court has previously observed that "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail … the result, all too often, is catastrophically maladjusted children." *In re T.S.M.*, 71 A.3d 251, 269 (Pa. 2013). **While there may be some bond between [Mother] and [the] Children, the need for stability, safety, and permanency lead this [c]ourt**

- 17 -

**to terminate parental rights** [under Subsection 2511(b)].

*Id.* at 42-44 (emphasis added).

The record supports the orphans' court's analysis and refutes Mother's claim that the court did not consider the bond between Mother and the Children. Although the court did not address Mother's older son, Da., specifically, the record reflects the court's proper consideration of the evidence and law in finding that termination was warranted under Section 2511(b).

III. <u>Termination of Mother's Parental Rights to B.L.S. and J.L.S.</u>

Mother argues the orphans' court improperly terminated her parental rights to B.L.S. and J.L.S. because "the lone expert witness[, Dr. Rosenblum,] who offered an opinion on termination[,] opined that [Mother's] rights to B.L.S. and J.L.S. should not be terminated …." Mother's Brief at 51. Mother states:

> Dr. Rosenblum was called by the Agency as its witness and his testimony was presented during the case-in-chief of the Agency. By presenting in its case-in-chief evidence which is contrary to its ultimate position on its petitions for termination, the Agency is bound by Dr. Rosenblum's admission, and termination with regard to B.L.S. and D.L.S. [*sic*] must be denied.

*Id.* at 50.

Mother acknowledges that when Dr. Rosenblum testified, he could not "make a recommendation that [Mother's] rights be terminated … to B.L.S. and J.L.S. … **because at the time of his evaluation[s]**, **these 2 children were not in a secure pre-adoptive foster home**." Mother's Brief at 11 (citing N.T., 10/6/22, at 66-67, 107, 108) (emphasis added). Mother ignores Dr.

Rosenblum's testimony that Mother "was very compromised in [her] mental functioning," and "not any closer to being successfully reunited" with Children. N.T., 10/6/22, at 84. Dr. Rosenblum concluded that the "major obstacle to reunification is [Mother's] lack of significant progress with mental health and substance abuse concerns," as well as deficient parenting skills. *Id.* at 80. Dr. Rosenblum added that "parenting skills alone are not what is preventing reunification. It's [M]other continuing to display concerning problems in [her] personal adjustment, mental health functioning, and dependence on drugs." *Id.*

Dr. Rosenblum recognized "it's the [c]ourt's decision on how the [c]ourt chooses to rule …." N.T., 10/6/22, at 66. He then opined, "with a full degree of psychological certainty, that the needs and welfare of [E.J.S.] and [D.L.S.] would be best met by the [c]ourt considering termination of parental rights and the ensuing adoption of the children by their foster parents." *Id.* As to B.L.S. and J.L.S., Dr. Rosenblum could not recommend termination because at the time of his evaluations, "they were not in a secure foster home that was committed to meeting their needs on a permanent basis." *Id.* Dr. Rosenblum added that he had "no idea where two of the children were placed [after April 2022], namely B.L.S. and J.L.S." *Id.* at 79. Dr. Rosenblum had recommended B.L.S. "be placed in a pre-adoptive foster home." *Id.* at 116. He explained:

> **The law may not require it**, but in terms of a psychological assessment, which I am being asked to offer the [c]ourt, in my

clinical opinion, I would very rarely offer a recommendation for termination of parental rights, unless I was confident that an alternative placement was proven to be working for the child.

*Id.* at 119 (emphasis added).

As the orphans' court stated:

Following the evaluations in 2022, Dr. Rosenblum recommended … [B.L.S.] and [J.L.S.] be moved to a pre-adoptive home and [B.L.S.] participate in PCIT with [Mother]. Dr. Rosenblum did not believe reunification could occur for [J.L.S.] and [B.L.S.] in the near future. While reunification was still possible[,] … Dr. Rosenblum believed [Mother] would have to demonstrate great improvement in several areas before reunification could be a realistic possibility. PCIT was recommended since [Mother was] not making progress and needed a greater understanding of [B.L.S.'s] behavioral problems.

Orphans' Court Opinion, 1/11/23, at 12-13.

Mother claims the orphans' court erred in terminating her rights to B.L.S., "given the Agency's failure to provide Court-Ordered PCIT therapy." Mother's Brief at 5. This claim is belied by Dr. Rosenblum's testimony that he recommended PCIT for Mother and B.L.S., "but as I've said multiple times now, that's not the intervention that's critical in terms of leading toward reunification." N.T., 10/6/22, at 109. Dr. Rosenblum repeated, "as I've said now many times, critical intervention has to be mental health functioning of [Mother]." *Id.* at 110.

We are also unpersuaded by Mother's claim that the court failed to properly consider the wishes of B.L.S. and J.L.S., who "clearly expressed … that they wished to return home and be reunited with" Mother. Mother's Brief at 50. Mother concedes B.L.S. and J.L.S. were "ages 6 and 4 respectively,

and typically their testimony may not be given a lot of weight by the courts." *Id.* Nonetheless, she states "it is important for the [orphans' c]ourt to consider that these 2 children have consistently held this position." *Id.* at 50-51. As indicated above, D.L.S. did not testify at the hearing, and the orphans' court considered the "limited testimony" of B.L.S. *See* Orphans' Court Opinion, 1/11/23, at 24. The court also considered other witness testimony regarding the Children's communications, behavior, and interactions with Mother. *See id.* at 43-44. Our review reveals no error.

For the reasons discussed above, we discern no error or abuse of discretion by the orphans' court. We therefore affirm the order terminating Mother's parental rights to Children D.L.S., J.L.S., E.J.S., and B.L.S.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 8/1/2023