J-A27008-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: K.V., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.R., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 934 MDA 2024 |

Appeal from the Order Entered June 5, 2024
In the Court of Common Pleas of Lackawanna County Orphans' Court at
No(s): 2023-00049

| | | |
|---|---|---|
| IN RE: ADOPTION OF: K.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.R., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 935 MDA 2024 |

Appeal from the Order Entered June 5, 2024
In the Court of Common Pleas of Lackawanna County Orphans' Court at
No(s): 2023-00047

| | | |
|---|---|---|
| IN RE: ADOPTION OF: K.V., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.R., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 959 MDA 2024 |

Appeal from the Order Entered June 5, 2024
In the Court of Common Pleas of Lackawanna County Orphans' Court at
No(s): 2023-00048

BEFORE: LAZARUS, P.J., KUNSELMAN, J., and McLAUGHLIN, J.

MEMORANDUM BY LAZARUS, P.J.:                    **FILED: DECEMBER 20, 2024**

J.R. (Mother) appeals from the orders, entered in the Court of Common Pleas of Lackawanna County Orphans' Court Division, involuntarily terminating her parental rights to her minor children, Ka.V. (born October 2007), Ki.V. (born October 2012), and K.R. (born July 2017) (collectively, Children).[1] After careful review, we affirm.[2]

On March 26, 2021, the Lackawanna County Office of Youth and Family Services (OYFS) received a referral alleging Mother had been incarcerated after violating her probation by testing positive for illegal substances. At the time of the violation, Children were in Mother's care.[3] On March 29, 2021, Children were placed into emergency custody with two kinship foster families.[4] Children were adjudicated dependent on April 29, 2021.[5] Due to concerns with Mother's drug use as well her problematic interactions with OYFS staff,

---

[1] Mother and her paramour, T.M., have another child who is Children's step-sibling and is not involved in this matter.

[2] The parental rights to Children's fathers, A.W. and A.V., were involuntarily terminated in October 2023 and January 2024, respectively. Neither father is a party to this appeal.

[3] Upon her incarceration, Mother left Children with a cousin. However, when that cousin later tested positive for methamphetamines, Children were placed into foster care.

[4] Foster mothers are Mother's ex-sister-in-law and maternal cousin.

[5] Children had been in placement, on an unrelated matter, from July 3, 2018 to May 19, 2020. At the request of OYFS, that dependency was terminated in October 2020. ***See*** N.T Termination Hearing, 5/30/24, at 41-42.

Mother's one-hour visits with Children were supervised. The visits were held biweekly at Outreach Community Resources (OCR).[6] Mother's visits never progressed beyond supervised or supportive throughout the life of this case. **See** N.T. Termination Hearing, 5/31/24, at 36.

Mother also had supervised phone calls with Children twice a week. **Id.**, at 17. However, after Mother "told the girls that the[ir] foster parents [were] sexually abusing [C]hildren in their home," **id.**, at 33-34, all phone communication between Mother and Children was stopped in late April/early May 2024. **Id.** at 34.[7]

OYFS created a family service plan (FSP) for Mother with the following objectives: (1) seek support through Women's Resource Center; (2) follow through with parole/probation recommendations; (3) comply with pretrial services; (4) manage mental health needs, including obtaining mental health assessments and follow-up treatments; (5) obtain drug and alcohol assessments and follow-up treatments; (6) undergo drug screens three times a week; (7) report any drug or alcohol use to OYFS staff; and (8) obtain and maintain employment. At a December 2021 permanency review hearing, Mother's FSP compliance and progress were each rated "moderate." At that

---

[6] Mother's visits were suspended at one point and then reinstated in January 2024. **Id.**, 5/31/24, at 11.

[7] Mother testified that she never alleged sexual abuse when she spoke to Children on the phone. **Id.** at 52, 55, 56. However, Service Access Management caseworker Jamie Rolon testified that she talked to foster mom as well as each of the Children, who confirmed that Mother made the statement and that the statement was false. **Id.** at 34-35.

time, OYFS caseworkers reported that Mother needed to be more consistent with her drug and alcohol screenings. *Id.*, 5/30/24, at 47-48.

At Mother's March 2022 permanency review hearing, her FSP[8] compliance and progress were downgraded to "minimal," it was noted that Mother was still screening inconsistently, and caseworkers indicated that Mother's last drug screen, from February 20, 2022, tested positive for cocaine. *Id.*, at 49. At her next permanency review hearing, Mother's compliance and progress on her FSP goals returned to "moderate" due to Mother screening more consistently and having graduated from an outpatient drug and alcohol rehabilitation program. *Id.* at 50.

At her next permanency review hearing in August 2022, Mother was noted to have been moderately compliant with her FSP goals, now had obtained a medical marijuana card, and had been prescribed Suboxone and antidepressants. *Id.* at 51. Caseworkers described Mother as still inconsistent with drug screening, noted that she had been unsuccessfully discharged from Safe Care for lack of attendance, and had not attended any Nurturing Mother program appointments. *Id.* at 52. At a December 17, 2022 permanency review hearing, Mother was deemed to be minimally compliant and to have minimally progressed with her FSP goals; Mother had also tested positive for cocaine on September 23, 2022, and she was under the influence

_____

[8] Mother's FSP had an added objective of obtaining parenting services, that included the Nurturing Mother's Group and Safe Care Program. *Id.* at 50.

at a visit. *Id.* at 53-54. In January 2023, OYFS added safe and stable housing as an FSP objective for Mother due to a threat that Mother may be evicted because she and T.M. were not paying rent on their Mulberry Street home. *Id.* at 55. A caseworker noted that Mother had been working with an assistance program to pay back some of her overdue rent but had refused to attend inpatient drug and alcohol treatment because she denied that she had relapsed following positive screens for cocaine and alcohol.[9] *Id.* at 56. Mother was deemed to have moderately complied with and minimally progressed with her FSP goals. *Id.* At a June 19, 2023 permanency review hearing, the court noted that Mother had not followed its December 2022 recommendation that she attend NA/AA meetings. *Id.* at 60-61.

On September 19, 2023, OYFS filed petitions to involuntarily terminate Mother's parental rights to Children pursuant to 23 Pa.C.S.A. §§ 2511(a)(2), (5), (8), and (b). The trial court held termination hearings on May 30-31, 2024. Kristy Vassell (OCR supervised visitation lead), Michelle Coyle (substance abuse program case manager), Sharon Roginski (OYFS

---

[9] Mother gave birth to another child, in January 2023, whose meconium tested positive for Gabapentin at birth. *Id.* at 57. In February 2023, after OYFS learned about this result, the agency requested that doctors go back and retest all of Mother's past samples for Gabapentin. *Id.* at 103. They also had Mother's samples, going forward, tested for the drug. Three of Mother's seven screens in January 2023 retested positive for Gabapentin. *Id.* at 104. One of Mother's August 2022 retests was positive for Gabapentin, as was her sole December 2022 retest. *Id.* at 104, 110. Finally, two of Mother's ten retests for February 2023 were positive for Gabapentin. *Id.* Notably, Mother denied that she had relapsed when she reentered her addiction treatment program in December 2022. *Id.* at 105. Mother had not been prescribed Gabapentin.

supervisor), Carissa Dube (OYFS caseworker), Jamie Rolon (Service Access Management caseworker), and Mother testified at the hearings. At the time of the hearings, Mother was unemployed, had no income, did not have a driver's license or own a car, and was on the verge of being evicted from the house that she shared with T.M. *See* N.T Termination Hearing, 5/31/24, at 30-31, 57.

The trial court granted OYFS' petitions to terminate Mother's parental rights, pursuant to subsections 2511(a)(2), (5), (8), and (b) of the Adoption Act,[10] concluding that Mother did not possess the protective capacity to care for Children and that termination was in Children's best interests. Mother filed timely notices of appeal[11] and contemporaneous Pa.R.A.P. 1925(a)(2)(i) statements of errors complained of on appeal.

On appeal, Mother raises the following issues for our consideration:

(1) Whether the [trial] court erred as a matter of law and/or manifestly abused its discretion in finding that [OYFS] had proven[,] by clear and convincing evidence[,] the grounds for termination of parental rights[,] pursuant to [sections] 2511[(a)](2), [(a)](5), and [(a)](8)[,] when there was credible testimony that [Mother] had addressed and/or was addressing the circumstances [that] originally necessitated placement,

---

[10] 23 Pa.C.S.A. §§ 2101-2938.

[11] By filing three separate notices of appeal, Mother has complied with the dictates of *Commonwealth v. Walker*, 185 A.3d 969 (Pa. 2018), which held that "when a single order resolves issues arising on more than one lower court docket, separate notices of appeal must be filed." *See In re M.P.*, 204 A.3d 976 (Pa. Super 2019) (applying *Walker* holding to termination of parental rights cases).

specifically drug use, mental health concerns, incarceration, and domestic violence, and those conditions no longer existed?

(2) Whether the [trial] court erred as a matter of law and/or manifestly abused its discretion in finding that the termination of Mother's parental rights was in [C]hild[ren]'s best interest[s], when there was no consideration regarding the bond between [Mother]/Child[ren], or between Child[ren]/Siblings?

Appellant's Brief, at 6.

In a proceeding to terminate parental rights involuntarily, the burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so. The standard of clear and convincing evidence is defined as testimony that is so clear, direct, weighty[,] and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue. It is well established that a court must examine the individual circumstances of each and every case and consider all explanations offered by the parent to determine if the evidence[,] in light of the totality of the circumstances[,] clearly warrants termination.

*In re Adoption of S.M.*, 816 A.2d 1117, 1122 (Pa. Super. 2003) (citation and quotation marks omitted); *see also In re C.P.*, 901 A.2d 516, 520 (Pa. Super. 2006) (party seeking termination of parental rights bears burden of proving by clear and convincing evidence that at least one of eight grounds for termination under section 2511(a) exists and that termination promotes emotional needs and welfare of child set forth in section 2511(b)).

We review a trial court's decision to involuntarily terminate parental rights for an abuse of discretion or error of law. *In re A.R.*, 837 A.2d 560, 563 (Pa. Super. 2003). Our scope of review is limited to determining whether the trial court's order is supported by competent evidence. *Id.*

Mother first contends that the trial court erred in terminating her parental rights under subsection 2511(a) where the court "ignored the fact that the conditions which necessitated placement did not continue to exist, and had been or were being remedied by [her]." Appellant's Brief, at 12. Specifically, Mother argues that she had been sober for over one year at the time of the termination hearing, had safe and appropriate housing, maintained constant visitation with Children, reported that she had been looking for work, was attending individual counseling, and was working on her medication-assisted treatment program. *Id.* at 18. Mother also claims that, at the time of the hearing, she had successfully completed several programs, including a parenting program, and was compliant with drug and alcohol programs through St. Rita's and T-PALS. *Id.*

At the termination hearing, caseworker Rolon testified that she first visited Mother, at the Mulberry Street home, in February 2024. Rolon testified that she reviewed Mother's progress up to that date with her, which included: certifications for life skills courses, parenting classes, and inpatient treatment. *See* N.T. Termination Hearing, 5/31/24, at 6-7. Rolon also testified that, at the time of the termination hearing, Mother was back in the Healthy MOMS program and was attending St. Rita's for medication assisted treatment. *Id.* at 7. Rolon testified that Mother had signed all releases and that, from her review of the prior caseworker's notes dating back to October 2023, Mother had not had any positive screens for non-prescribed illegal substances. *Id.* at 7-8; *id.* at 8 (Rolon testifying from October 2023 until May 2024, that "there[

have] been no ongoing . . . concern[s with Mother's] drug screens"). However, Rolon also testified that she did not know whether Mother had made any attempts to address domestic violence issues and that, in fact, she did not think Mother had obtained any type of domestic violence counseling. *Id.* at 20

Community Outreach supervising leader Vassell testified at the termination hearing that she was concerned for Mother's safety due to T.M.'s aggressive behaviors. *See* N.T. Termination Hearing, 5/30/24, at 11. Substance abuse program case manager Michelle Coyle also testified that Mother and T.M. had a tumultuous relationship, that Mother discussed filing a protection from abuse act petition against T.M., and, that after one very troubling incident, Coyle advised Mother to seek help at a women's resource center to obtain safe housing. *Id.* at 21. Coyle testified that in January 2023, she "had concerns [regarding Mother's] living environment and her mental health." *Id.* at 24. Mother, who attended remote Healthy MOMS Program meetings "sporadically, but not consistently," was never successfully discharged from the program. *Id.* at 28-29. Although Mother met consistently with a certified recovery specialist (CRS) in February and March of 2023, and attended Healthy MOMS Zoom meetings in February, March, and April 2023, Coyle testified that Mother was only "minimally" compliant because she did not attend the Healthy MOMS meetings twice a week. *Id.* at 26.

Sharon Roginski, an OYFS supervisor, oversaw and reviewed Mother's case files, prepared by OYFS caseworkers who met with Mother's family and

developed her FSPs. *Id.* at 35. Roginski relayed that in January 2024 she confirmed that Mother had called 911[12] after she had a "disagreement" with T.M. *Id.* at 65. A transcript of the 911 call, which was admitted into evidence, indicates that Mother called 911 on January 1, 2024, because she was being threatened by T.M. and told the operator that she needed help because T.M. had told her he was going to bring some girls to the house to "beat her up." *Id.* at 70.[13] *See also id.* at 112 (OYFS caseworker testifying 911 call made by Mother indicated her "boyfriend was assaulting [her]" and that it was "a call to the home for simple assault, harassment of a physical strike"); *id.* (911 call included information of "argument in regards to cheating [and that T.M. had] hit [Mother] in the head and stomach"); *id.*, 5/31/24, at 69-70 (Mother sent text to OCR visit supervisor on February 19, 2024, saying, "[T.M.] kicked me out of our house. Will you be a witness on how aggressive he is to me and i[n] front of the baby?"). During an OCR appointment, Roginski attempted to talk to Mother and T.M. about the 911-call incident. However, Roginski testified that T.M. made her "feel threatened" and that another staff member had to come into the room to defuse the situation. *Id.* at 65-66.

_____

[12] OYFS subpoenaed the transcription of the recorded 911 call, which was entered as OYFS Exhibit 11 at the termination hearing. *Id.* at 68-69.

[13] 911-call logs indicate that T.M. called 911 minutes after Mother's call to ask officers to go to his house and make sure that "everything was OK [because Mother] was threatening him and . . . someone had broken a window and that he believed that the TV might be broken." *Id.* at 71.

Roginski reiterated that Mother "always [had] a reason that she didn't want to go to [programs or groups]"—things that were required in her FSPs. *Id.* at 73, 93-94. *See also id.* (Roginski testifying Mother could not do Safe Care "because it wasn't convenient to her schedule"); *id.* at 73, 93 (Roginski testifying Mother did not go to Mother's Group because she did not like the person facilitating the sessions). OYFC caseworker Dube testified, throughout the time she worked with Mother, Mother never acknowledged or took responsibility for the fact that she was actively using drugs. *Id.* at 119.

Mother testified she is no longer "fearful of [T.M.]," that she and T.M. have participated in some relationship counseling, and that she is involved in a medication management program and uses her outpatient program counselor at T-PALS as a reference to keep her sober. *See* N.T. Termination Hearing, 5/31/24, at 43-45. Mother also testified that she has maintained sobriety from the beginning of 2024 up to the date of the termination hearings at the end of May 2024. *Id.* at 45. Finally, Mother testified that Children expressed to her that they "all want to be together." *Id.* at 48.

Despite the fact that Mother testified she "100%" has the ability to protect Children and can financially support them, *id.* at 50, the record evidence suggests otherwise. *See* N.T. Termination Hearing, 5/30/24, at 112-13 (police called to Mother and T.M.'s house in April and May 2022 amidst domestic disturbance claims, one alleging T.M. was hitting Mother); *id.*, 5/31/24, at 20 (caseworker Rolon testifying she did not know whether Mother had made any attempts to address domestic violence issues); *id.* (caseworker

Rolon testifying she did not think Mother had obtained any type of domestic violence counseling); **see also id.** at 96 (Roginski testifying Mother still living with T.M. at Mulberry Street address); **id.** at 97-98 (Roginski testifying $12,000.00 judgment for rent arrears entered against Mother and T.M. in September 2023);[14] **id.**, 5/31/24, at 16 (court taking judicial notice that order acknowledges eviction process taking place for Mother's Mulberry Street residence, but that additional hearing is necessary before Mother can be formally evicted).

Mother's continued inability to properly address her drug issues—including never attending court-ordered AA/NA meetings and failure to acknowledge the fact that she has drug addiction issues—and her incapacity to provide a safe home environment for Children due to her volatile relationship with T.M. causes Children "to be without essential parental care, control[,] or subsistence necessary for [their] physical or mental well-being." 23 Pa.C.S.A. § 2511(a)(2). Moreover, Mother has demonstrated, over the protracted life of this case, that she either refuses to or cannot remedy these issues, most notably by failing to comply with a December 2022 court order to attend AA or NA meetings. Based upon the testimony presented at the termination hearings, we find that competent evidence supports the trial

---

[14] Mother testified that her landlord had agreed to allow T.M. to pay between $700 and $1,000 a month, in addition to their monthly $1,800 rental payments, in order to be able to remain in the premises and not be evicted. **Id.**, 5/31/24, at 94. **See also** Respondent's Exhibit 2. Mother is unemployed and testified that T.M. makes between $15-$16 an hour at his job.

court's decision to terminate Mother's parental rights under subsection 2511(a)(2) and discern no error of law or abuse of discretion.[15] *See A.R.*, 837 A.3d at 563; *see also In re E.M.*, 908 A.2d 297, 303 (Pa. Super. 2006).[16]

Next, Mother argues that the court erred in terminating her parental rights under subsection 2511(b),[17] where severing the bond between her and

---

[15] Pursuant to subsection 2511(a)(2):

> **(a)** *General rule*. The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> *   *   *
>
> **(2)** The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A. § 2511(a)(2).

[16] Having found sufficient evidence to affirm the trial court's orders terminating Mother's parental rights to Children under subsection 2511(a)(2), we need not address whether termination was proper under subsections 2511(a)(5) or (8). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (en banc) (Superior Court may affirm trial court's decision regarding termination of parental rights with regard to any singular subsection of section 2511(a)).

[17] Subsection 2511(b) states:

> **(b)** *Other considerations.* The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated

*(Footnote Continued Next Page)*

Children "would be detrimental [and] not serve their long[-]term needs and welfare, especially in light of the fact that[,] in addition to severing the maternal bond, it could result in severing [] sibling bond[s] as well." Appellant's Brief, at 12.

In *In re T.S.M.*, 71 A.3d 251 (Pa. 2013), our Supreme Court noted that "if the grounds for termination under subsection (a) are met, a court 'shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.'" *Id.* at 267, citing 23 Pa.C.S.A. § 2511(b). Moreover, "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into needs and welfare of a child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005). Further, in *In re E.M.*, 620 A.2d 481 (Pa. 1993), our Supreme Court held that the determination of the child's "needs and welfare" requires an examination of "the status of the natural parental bond." *Id.* at 485. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond.

---

solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing[,] and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(b).

*In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012), *overruled on other grounds by In re Adoption of L.B.M.*, 161 A.3d 172 (Pa. 2017).

With regard to the parent-child bond, Roginski testified that while "all three children love their mother," terminating the parental bonds with Mother "would not create any additional stress to [C]hildren." *Id.* at 63-64. In fact, Roginski stated that, recently, Mother's visitation with Ka.V. and Ki.V. had been suspended due to the stress it created for them. *Id.* at 64. Roginski testified that Mother had not made enough progress with her FSP goals "to be able to safely care for and reunify with [C]hildren." *Id.* at 72. In particular, Roginski testified:

> [T]he biggest concern at this point is [Mother's] ability to protect [C]hildren from violence in the home. She is not taking any action to protect herself [a]nd [C]hildren have expressed their concern for [M]other's safety and [] stated that they don't want to be there when [T.M.] is there.

*Id.* at 72-73. *See id.* at 88 (Roginski affirming Children have concern and fear of being with T.M. in home). Finally, Roginski testified that terminating Mother's parental rights was in Children's best interests and that termination "would [not] cause irreparable damage to [Children]." *Id.* at 43, 89.

Under a subsection 2511(b) analysis, a court must assess "[w]hether [a parent-child] bond exists to such a considerable extent that severing the natural parent-child relationship would be contrary to the needs and welfare of the children[.]" *In re K.Z.*, 946 A.2d 753, 763 (Pa. Super. 2008). Moreover,

[i]n addition to a bond examination, the court can equally emphasize the safety needs of the child under subsection (b), particularly in cases involving physical or sexual abuse, severe child neglect or abandonment, or children with special needs. The trial court should also examine the intangibles such as the love, comfort, security, and stability the child might have with the foster parent. Another consideration is the importance of continuity of relationships to the child and whether the parent-child bond, if it exists, can be severed without detrimental effects on the child. All of these factors can contribute to the inquiry about the needs and welfare of the child.

*Id.*

Here, the trial court correctly emphasized Children's safety needs when it concluded terminating Mother's parental rights under subsection 2511(b) was proper. While we acknowledge the fact that Mother and Children may have a bond and love one another, several witnesses—all familiar with Mother's situation—testified that they feared for both Mother's and Children's safety in light of Mother's ongoing relationship with T.M., with whom she continues to live and who is her sole source of income. In addition to the safety issues, Mother's unemployment and unstable housing status also greatly impact Children's needs and welfare. Moreover, caseworker Rolon testified that Children's foster placements are safe and appropriate environments for Children and that Children are happy with their foster families. *Id.*, 5/31/24, at 36.[18]

---

[18] Mother also complains that terminating her parental rights will cause the siblings to be split between their two foster homes. We remind Mother that "the goal of preserving the family unit cannot be elevated above all other factors when considering the best interests of the children, but must be weighed in conjunction with other factors." *In re K.D.*, 144 A.3d 145, 153

*(Footnote Continued Next Page)*

Here, the trial judge acknowledged that he has "been involved with this case from the very beginning and h[a]s been there for . . . every single [permanency] review hearing." *Id.* at 107. Based on the record evidence, we conclude that the trial court properly determined that terminating Mother's parental rights under subsection 2511(b) was proper. *See In the Int. of K.T.*, 296 A.3d 1085, 1090 (Pa. 2023) (appellate courts should defer to trial judges who see and hear parties and can determine credibility to be placed on each witness and gauge likelihood of success of current permanency plan; even if appellate court would have come to different conclusion, court is not in position to reweigh evidence and trial court's credibility determinations based on cold record). We conclude that the court's order is supported by competent evidence and discern no abuse of discretion or error of law. Children need permanency, had been in placement for over 22 months at the time of the hearings, are happy and safe in their current placements, and Mother simply cannot provide them the safety and stability they desperately need. *See A.R.*, 837 A.2d at 563.

---

(Pa. Super. 2016) (citing *In re Adoption of G.R.L.*, 26 A.3d 1124, 1127 (Pa. Super. 2011). Moreover, there is nothing in the record to suggest that foster parents will prevent sibling contact or visits.

Orders affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 12/20/2024